CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND, and Howard McDougall, Trustee, Plaintiffs/Counterdefendants,

v.

GATEWAY FOODS OF TWIN PORTS, INC., Defendant/Counterplaintiff.

GATEWAY FOODS OF TWIN PORTS, INC., Plaintiff,

v.

CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND, and Howard McDougall, Defendants.

No. 95 C 5020.

United States District Court, N.D. Illinois, Eastern Division.

Dec. 17, 1996.

---

**4.** *See* Memorandum of Law Supporting Defendants' Motion for Summary Judgment, Docket No. 8, Page 5.

**5.** *Supra* note 4.

**6.** *Protocare,* 866 F.Supp. at 762.

Albert M. Madden, Margaret Mary Fahrenbach, Central States Law Department, Rosemont, IL, Robert Anthony Coco, Patrick J. Connor, Central States Law Department, Des Plaines, IL, for plaintiffs/Counterdefendant.

Dale Lee Deitchler, Gregory M. Weyandt, Rider, Bennett, Egan & Arundel, PLLP, Minneapolis, MN, Clifford E. Yuknis, Lipscomb & Yuknis, Chicago, IL, for defendant/Counterplaintiff.

## OPINION AND ORDER

NORGLE, District Judge:

Before the court are two motions for summary judgment, each filed by the respective Plaintiffs in the above two actions, and both involving the same issues of fact and law. For the following reasons, the court grants the motion filed by Central States, Southeast and Southwest Areas Pension Fund, and denies the motion filed by Gateway Foods of Twin Ports, Inc.

## I.

Central States, Southeast and Southwest Areas Pension Fund ("Central States") initially filed a declaratory judgment action (Case No. 95 C 5020) against Gateway Foods of Twin Ports, Inc. ("Gateway"). Central States seeks a court declaration that Gateway is not entitled to a refund of $440,000 in alleged mistakenly-paid pension contributions. Before Central States effectively served Gateway with the first Complaint, Gateway filed suit against Central States (Case No. 95 C 5066) seeking restitution of the same contributions at issue in Case No. 95 C 5020. Gateway then filed a counterclaim, also seeking restitution of the pension contributions, in Case No. 95 C 5020.

Central States is a multiemployer, defined benefit pension fund that provides specified monthly retirement benefits to employees who satisfy the plan's vesting requirements and are covered by collective bargaining agreements negotiated between employers and local union affiliates of the International Brotherhood of Teamsters ("IBT"). Participating employers, such as Gateway, contribute to Central States at weekly rates, which are set forth in the collective bargaining agreement between the employer and the IBT, ranging between $6 (Benefit Class 1) and $124 (Benefit Class 17) per week per covered employee. Central States is managed by a Board of Trustees ("Board") consisting of eight representatives, four selected by employer associations and four selected by unions affiliated with the IBT.

The amount of an employee's retirement benefit depends primarily upon three factors, the employee's age at retirement, the number of years of earned pension credit, and the employee's benefit class based upon the contribution rate paid by the employer on the employee's behalf. When an employee retires, his or her benefit amount is fixed for the remainder of the retiree's life, and does not change even if his or her employer subsequently agrees to contribute on behalf of its active employees at higher rates (that correspond with a higher benefit class) or lower rates (corresponding with lower benefit classes).

From January 1, 1989 to January 31, 1995, both Gateway and Central States were bound by a collective bargaining agreement ("1989–1995 Agreement") that required Gateway to contribute to Central States as follows:

*PENSION:* Effective February 1, 1989, [Gateway] shall contribute to [Central States] the sum of $65.00 per week, per the 1982 Schedule of Contribution, for each employee covered by this Agreement who has been on the payroll thirty (30) days or more, except as provided in this Agreement.

\*   \*   \*   \*   \*   \*

[GATEWAY] AGREES THAT IT WILL CONTINUE TO FUND THE EXISTING BENEFIT LEVEL, INCLUDING THE TRANSITION BENEFIT, FOR THE TERM OF THIS AGREEMENT. [GATEWAY] UNDERSTANDS THAT ITS CONTRIBUTIONS WILL INCREASE TO $69 A WEEK IN 1990. EFFECTIVE ON FEBRUARY 1 OF EACH YEAR, 1991 THROUGH 1994, THE PENSION RATE TO BE PAID BY [GATEWAY] WILL BE ESTABLISHED BY [CENTRAL STATES] TRUSTEES.

On December 23, 1991, Central States received a letter from the union ("union letter") which provided as follows:

Re: Gateway Foods—Account #: 3018630–0101

P.O. Box 1149, Gateway Court, Superior, WI 54880

Pension Contributions Effective 02–01–92

Dear Sir & Brother:

Regarding the above captioned matter, the new pension rate for [Gateway] is $79.00 per week effective February 1, 1992, $83.00 per week effective February 1, 1993, and $85.00 per week effective February 1, 1994.

Gateway received a copy of the letter on December 20, 1991.

The $65 contribution rate of the 1989–1995 Agreement, for which Gateway was obligated to pay the initial year, corresponds with Benefit Class 15B. The $69 rate corresponds with Benefit Class 15C. The 15C level is the highest rate within Benefit Class 15. The

rates set forth in the union letter correspond with Benefit Classes 16A, 16B, and 16C, respectively.

Central States billed Gateway at the rates set forth in the 1989–1995 Agreement and the union letter, and Gateway paid Central States those amounts reflected in the bills. During the period between February 1992 and January 31, 1995, a period in which Gateway paid to Central States Benefit Level 16 rates, fifteen Gateway employees retired and applied for retirement benefits. Central States calculated those employees' pension rates using the applicable Benefit Class 16 rates, resulting in pension payments totalling $8,960 more per month than payments calculated with the Benefit Class 15C level. To date, the amount paid by Central States to Gateway retirees who retired after February 1, 1992, exceeds the amount payable at Benefit Class 15C by either $389,567.50, the amount calculated by Central States, or $280,000.35, the amount calculated by Gateway. Using life expectancy tables, Central States estimates that the future Class 16 Benefit payments to Gateway retirees that retired after February 1, 1992 will exceed the Class 15C benefit amount by $898,688.35.

In late 1994, Gateway discovered an alleged overpayment of $440,000 when it began to prepare to negotiate a successor to the 1989–1995 Agreement. According to Gateway, its contribution rate should have remained at the Benefit Class 15C level, $69, and that its payments for levels higher than 15C should be refunded by Central States. After the overpayment discovery, Central States made a discovery of its own: auditors employed by Central States revealed that Gateway owed Central States certain contributions for the years 1989 through 1991. Gateway paid the amount requested by Central States in December 1994.

On March 29, 1995, Gateway made its initial request for the alleged $440,000 overpayment. Under the Central States trust agreement and pension plan, employer refund requests must be submitted to the Board and the Board's decision is "binding upon all parties to the Trust Agreement, the Union, each Contributing Employer, all individuals claiming benefits pursuant to this Pension Plan ... and all other individuals engaging in any transaction with the Pension Fund." (Central States Pension Plan, p. 67, § 7.03.) Gateway submitted its refund request to the Board, and the Board began an investigatory process. The Board assigned the matter to the Contracts Subcommittee, which deferred the matter in order to obtain additional information regarding the request. Pursuant to the subcommittee's request, Central States' attorney sent a letter to Gateway's attorneys requesting additional information. Gateway provided the Board with the data.

The subcommittee later recommended that the request be denied, but it is unclear whether the subcommittee relied upon the additional data supplied by Gateway. However, it is clear that the Gateway response was attached to the written agenda item presented to the entire Board when it met on August 22, 1995. On that date, the entire Board met, discussed Gateway's arguments, viewed the documents submitted by Gateway, and chose to accept the subcommittee recommendation and to reject the refund request. Gateway now seeks to overturn the Board's decision by filing its equitable restitution action (Case No. 95 C 5066) against Central States. Central States, on the other hand, requests in its own declaratory relief action (Case No. 95 C 5020) that this court affirm the Board's decision.

II.

Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). "Only disputes that might affect the outcome of the suit under the governing law will properly preclude entry of summary judgment." *Id.* at 248, 106 S.Ct. at 2510. "[A] complete

failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

### III.

■ The Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001–1461, does not provide a remedy for employers to seek to compel a refund of contributions mistakenly made to a pension fund. It does provide pension plan trustees with permission to repay employers for erroneous overpayments, but does not mandate repayments. 29 U.S.C. § 1103(c)(2)(A)(i) & (ii). For that reason, the Seventh Circuit created a federal common law cause of action for recovery of such contributions. *UIU Severance Pay Trust Fund v. Local 18–U*, 998 F.2d 509, 512 (7th Cir.1993). Under the federal common law, an employer may maintain an equitable restitution action. But "because the cause of action ... is equitable in nature, recovery will not follow automatically upon a showing that the [employer] contributed more than was required." *Id.* at 513. Rather, the employer can prevail only if "the equities favor it." *Id.*

■ But here, the Board found that the alleged overpayments were not the result of mistakes of law or fact. To the contrary, the Board determined that Central States made the purported excessive payments (corresponding to levels higher than Benefit Class level 15C) in accordance with the 1989–1995 Agreement. In other words, the Board interpreted the various provisions of the pension plan, and found that the Central States payments were not in error. According to the 1989–1995 Agreement, the Board's interpretation is "binding upon all persons dealing with the Fund." Because of the binding nature of the decision, and because the pension fund gives the Board final authority when determining "questions ... [regarding] the construction of the language or meaning of the rules and regulations" set forth in the 1989–1995 Agreement, the Board's interpretation cannot be overturned by a federal court absent a showing that the Board's decision was arbitrary and capricious. *Firestone*

*Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 111, 109 S.Ct. 948, 954–55, 103 L.Ed.2d 80 (1989); *Morton v. Smith*, 91 F.3d 867, 870 (7th Cir.1996); *Russo v. Health, Welfare & Pension Fund, Local 705, Int'l Bhd. of Teamsters*, 984 F.2d 762, 765 (7th Cir.1993). Therefore, the instant motion's outcome turns on two questions: (1) whether the Board acted in an arbitrary and capricious manner when determining that the alleged overpayments were made pursuant to the relevant contract terms, not a result of a mistake of fact or law; and (2) if so, whether "the equities favor" restitution.

### A. Review of the Board's Determination

Under the arbitrary and capricious standard, the court must weigh numerous factors: "the impartiality of the decisionmaking body, the complexity of the issues, the process afforded the parties, the extent to which the decisionmakers utilized the assistance of experts where necessary, and finally the soundness of the fiduciary's ratiocination." *Chalmers v. Quaker Oats Co.*, 61 F.3d 1340, 1344 (7th Cir.1995). The court may consider only those materials presented to the Board, *Perry v. Simplicity Eng'g*, 900 F.2d 963 (6th Cir.1990), and will not overturn the Board's decision so long as the decision is based on a reasonable interpretation of the plan's language and the evidence before the Board. *Russo*, 984 F.2d at 765. According to the Seventh Circuit and the Black's Law Dictionary (6th Ed.1990), "a decision is 'arbitrary and capricious' when it is 'willful and unreasonable' and 'without consideration or in disregard of facts or law or without determining principle.'" *Plummer v. American Inst. of Certified Public Accountants*, 97 F.3d 220, 229 n. 8 (7th Cir.1996). "Before concluding that a decision was arbitrary and capricious, a court must be very confident that the decisionmaker overlooked something important or seriously erred in appreciating the significance of evidence." *Wahlin v. Sears, Roebuck & Co.*, 78 F.3d 1232, 1235 (7th Cir.1996). "Although it is an overstatement to say that a decision is not arbitrary and capricious whenever a court can review reasons stated for the decision without a loud guffaw, it is not much of an overstatement." *Pokratz v.*

*Jones Dairy Farm*, 771 F.2d 206, 209 (7th Cir.1985).

### 1. *Impartiality, Complexity, and Process Afforded Gateway*

■ Before delving into the substance of the Board's decision, the court must first discuss the impartiality of the Board, the complexity of the issues presented to the Board, and the process afforded Gateway prior to the Board's determination. The court notes that the Board consists of eight representatives, four representatives designated by three employer associations, and four from IBT-affiliated unions. Thus, Gateway has, at minimum, two "voices" on the Board, one from the employer association of which it is a member, and one from the union with which it is affiliated. The court can discern from the facts no bias or partiality by the Board in making its decision. Moreover, the predominant issue presented to and decided by the Board, whether the alleged overpayments were made as a mistake or made pursuant to the relevant Trust Agreement and Pension Plans, does not pose a particularly complicated query. The issue involved a simple interpretation of the contract language, an issue which the relevant pacts gave the Board "final authority" to decide, and called upon the Board to resolve conflicting successive sentences.

Finally, the Board afforded Gateway adequate opportunity to make its contentions known to the Board prior to its ruling. Gateway argues that the ruling by the Board is procedurally defective because it did not require a personal appearance by a Gateway attorney. But Gateway's argument fails for two reasons: the record shows that Gateway neither had the intention nor desire to make a personal appearance before the Board, and Gateway failed to direct the court to any contractual, statutory, or legal authority necessitating a party's personal appearance before a pension fund board of trustees.

First, Gateway was aware that the matter was going to be presented to the subcommittee on June 6, 1996. Yet, Gateway neglected to appear. After the subcommittee meeting, Gateway's attorney requested that the Central States attorney "share th[e] information [provided in response to the Board's request] with the Trustees as early as possible. Please be advised that our client has instructed us to commence litigation if we do not receive a satisfactory response by September 1." This request evidences that Gateway neither expected nor desired a personal appearance.

Second, Gateway failed to provide the court, nor can the court find, a contractual or statutory basis for its contention that was entitled to a personal appearance. The record reflects that such a personal appearance was unnecessary and had no effect on the outcome of the ruling because the relevant facts were not in dispute. Gateway called upon the Board solely to resolve a contractual interpretation. Upon a reading of the relevant contracts, the Board determined that Gateway was obligated to make the alleged overpayments, and thus did not deserve a refund. The Board based its determination upon its interpretation of the relevant terms discussed in Section One of this Order, and the personal appearance of either party's attorney was unnecessary as it would not aid in its review of the documents.

Contrary to Gateway's averments, the chronology of events in the record reveals that the Board allowed Gateway to take part in the review process. The Board deferred action on Gateway's refund request until after it gathered additional information. The Board, through Central States' Division Manager of the Accounts Receivable Department, made known to Gateway the reasons contended by Central States why the benefit levels increased to the Benefit Class 16C level. Further, the Division Manager submitted to Gateway six interrogatories in order to allow Gateway to provide specific written responses to each of Central States' contentions. Gateway responded, and the Board assigned the matter to the Contracts Subcommittee to make a recommendation. The subcommittee recommended a denial of the refund request. Though it is unclear whether the subcommittee reviewed the Gateway documents, the record makes clear that the information was submitted to the Board as a whole, and that the data supplied

by Gateway was among the evidence considered by the Board prior to making its ruling. *See* Minutes of Pension Board Hearing, August 22, 1995 ("In an attempt to gather more information concerning the Employer's request, staff issued the attached letter dated July 13, 1995. The response from the Employer's attorney, dated July 28, 1995, *is attached.*" (emphasis added)). Moreover, the Board allowed Gateway the chance "to send in any additional documentation that [Gateway felt the Board] should consider regarding this matter." After a full discussion by the entire Board, the Board unanimously voted to accept the recommendation, and to deny the request. It is clear from the above facts that the Board allowed Gateway ample opportunity to provide the Board with its arguments as well the documents upon which it based the arguments. The Board considered these documents, but rejected the argument.

In sum, the record reflects that the impartial Board allowed Gateway to make its contentions and data known to it prior to rendering its decision on a rudimentary contract interpretation issue. Absent a decision by the Board that defies reason and lacks an evidentiary base, the court will not overturn the Board's ruling.

### 2. Soundness of the Board's Decision

■ At the outset, the court notes that Gateway neglected to refer it to any potential document overlooked by the Board which, had the Board given the document proper attention, would have swayed the outcome. That failure alone justifies a finding that the Board's ruling was not arbitrary and capricious. Nevertheless, the court will discuss the merits of the Board's decision.

Both parties apparently concede that the 1989–1995 Agreement was ambiguous with respect to contribution rates. Though the first and third sentences in the 1989–1995 Agreement, which relate to contribution rates, are not contradictory on their face, their inconsistencies surface when viewed the sentences in light of the union letter, which sets forth rates that correlate to rates higher than Benefit Class 15 levels. Accordingly, because the sentences do not mesh with each other, the Board has the duty to make a final and binding interpretation of those terms of the 1989–1995 Agreement that relate to the pension fund.

Looking to the facts submitted to the Board by both Central States and Gateway, the court finds that the Board did not act in an arbitrary or capricious manner and, as a matter of law, may not overturn the Board's determination. The evidence before the Board overwhelmingly favors its decision that the contributions over-and-above the Benefit Class 15C rate were consistent with the 1989–1995 Agreement. First, reading the conflicting sentences together with the union letter, the Board's determination was simple: it was clear to the Board, Central States, and to Gateway's employee's union (by way of the union letter), that the relevant provisions required a progressive increase up-and-above the Benefit Class 15C level. Second, any reading contrary to the interpretation of the board would render the terms of the successor collective bargaining agreement, the 1995–2000 Agreement, illogical and unfair to Gateway and its retirees.

Though the first sentence states that the Benefit Class 15 contribution rate lasted "for the term of th[e] agreement," the third sentence clearly entitles the Board to establish the contribution rate for the remaining four years of the 1989–1995 Agreement. Apparently, the Board deferred to Local Union No. 346 to determine the remaining rates.

The local union sent the above-referenced union letter, which listed the contribution rates as $79 (Benefit Class 16A) for 1992, $83 (Benefit Class 16B) for 1993, and $85 (Benefit Class 16C) for 1994. The union sent a copy of the union letter via certified mail to Gateway. Gateway made no written or oral response to the letter. Consequently, the Board billed, and Gateway paid the Board, rates consistent with those in the union letter, including those rates through the end of the 1989–1995 Agreement period in effect. Most importantly, Central States provided Gateway retirees with pension benefits corresponding to the increased rates. Neither Gateway nor its retirees complained about the "overpayment" of pension *benefits*; but Gateway now complains about the alleged

overpayments of pension *contributions.* With those facts in mind, the court finds that the interpretation adopted by the Board is a reasonable interpretation of the plan's language and the evidence in the case and, accordingly, cannot be found to be arbitrary and capricious.

Second, a review of the 1995–2000 Agreement, which the Board also reviewed prior to making its ruling, buttresses the Board's interpretation of the predecessor collective bargaining agreement, the 1989–1995 Agreement. According to the Board's decision, the 1989–1995 Agreement concluded at a Benefit Class 16C. The 1995–2000 Agreement lists does not list specific Benefit Class levels, but sets forth rates which correspond with Benefit Class levels 16C, 17b(A), 17b(B), 17b(C), and 17b(D), respectively, for the five years of the agreement's viability. But the 1995–2000 Agreement restricts the increases to single level increments, and requires employers to remain at each benefit level for at least twelve months. Also, because the two agreements overlap, the initial 1995–2000 Agreement Benefit Class level must be the same as the final rate of the 1989–1995 Agreement. Therefore, if Gateway was classified at a Benefit Class 15C for the entire duration of the earlier contract, Gateway would not reach Benefit Class 17 status until the third year of the 1995–2000 Agreement (level 15 for the initial year, 1995, level 16 for the second year, 1996, and level 17 for the third, fourth, and fifth years). Put another way, an interpretation contrary to that of the Board would have two effects. First, Gateway would have to pay for pension contributions relating to Benefit Class 16 rates, but, for the entire 1996 year, its employees would receive benefits computed using the Benefit Class 15C variable. Second, Gateway would pay a total of $96,000 more than the amount necessary to fund the Benefit Class 15 benefit level. These effects would be unjust not only to the Gateway retirees but to Gateway itself.

Upon consideration of the above facts, which were all presented to and considered by the Board prior to its decision, the court finds the Board's decision to be well-grounded in reason. Gateway failed to provide the court with any evidence to show that the Board disregarded an important document or failed to appreciate a certain document's significance. Absent direction by Gateway, and after the court's own research of the data submitted to the Board, the court concludes that the Board based its decision that the relevant contract provisions obligated Gateway to make the alleged overpayments to be reasonable, just, and consistent with the relevant contract terms. The Board's determination was not arbitrary and capricious, and thus its decision that the payments were mandated by the pension plan and trust agreement must stand. As a result, the court need not discuss whether equity favors the return of the alleged mistakenly-paid contributions. Nevertheless, the court will continue.

### B. Equitable Restitution

Even if the court found the Board's decision to be arbitrary and capricious, it nonetheless would have denied the motion because "the equities do not favor" restitution. Central States argues that "there is no equity in Gateway's claim because Central States and Gateway's retirees changed their positions based upon Gateway's payments." The court agrees.

The common law action of restitution is "a device to avoid unjust enrichment." *Central States Health and Welfare Fund v. Pathology Labs. of Ark., P.A.,* 71 F.3d 1251 (7th Cir.1995). Gateway claims that it is deserving of the $440,000 reimbursement because it paid the amount "by mistake." However, Gateway overlooks a very important fact: Central States relied upon this supposed mistake to its detriment; to date, Central States paid Gateway retirees $280,000.35 (using Gateway's calculation) in excess of the Benefit Class 15C amounts. Further, Central States forecasts that it will pay a total of $1.3 million as a result of the alleged overpayment. Gateway disputes the $1.3 million figure, but itself figures the amount to be approximately $900,000. In other words, the facts in the record reveal that Central States did not receive an enrichment—a necessary predicate to a finding of *unjust* enrichment—as a result of the alleged overpayments. Instead, Gateway has received exactly what it

paid for, increased pension benefits for its retired employees, and Central States will pay $1.3 million more than it would have had Gateway made Benefit Class 15C contributions the entirety of the contract period. Absent an enrichment, let alone an unjust one, the court finds that Gateway is not equitably entitled to a refund of its $440,000 in supposed excess contributions. *See Construction Indus. Ret. Fund v. Kasper Trucking, Inc.*, 10 F.3d 465, 467 (7th Cir.1993) ("The welfare fund pooled the money to provide [health care] benefits for all persons on whose behalf contributions were made. Because the drivers received the health coverage for which they paid for ..., no one is entitled to restitution."). Accordingly, the court would have granted Central States motion, thus denying that of Gateway, had the court found that the Board's decision was arbitrary and capricious.[1]

## IV.

Because the Board's decision (that the applicable contract provisions obligated Gateway to make the alleged overpayments) was not arbitrary and capricious, the court is without authority to overturn the Board's ruling. However, had the court found the Board's determination to be unreasonable and factually unsupported, it would have nevertheless found that the relevant equitable factors cut against ordering restitution.

As a result of the above holdings, the court makes the following findings:

(1) Regarding Central State's Complaint in Case No. 95 C 5020, the court declares that Gateway is not entitled to the requested refund amount, and enters judgment in favor of Central States and against Gateway;

(2) Regarding Gateway's Counterclaim in Case No. 95 C 5020, the court finds that the undisputed facts in the record do not warrant equitable restitution, and enters judgment in favor of Central States and against Gateway;

(3) Because the court enters judgment in favor of Central States on both the original Complaint and the Counterclaim in 95 C 5020, the court terminates the case. That case is dismissed in its entirety;

(4) Regarding Gateway's Complaint in Case No. 95 C 5066, the court finds that the undisputed facts in the record do not warrant equitable restitution, and enters judgment in favor of Central States and against Gateway;

(5) Because the court enters judgment in favor of Central States on the Complaint in 95 C 5066 the court terminates the case. That case, too is dismissed in its entirety.

IT IS SO ORDERED.

1. Central States raises several additional arguments. Central States contends that Gateway's failure to object to the contribution increase at the time it received the union letter reflecting those increases bars the instant claims raised by Gateway. Further, Central States submits that Gateway ratified the contribution rate increase by its failure to object to the union letter. However, the court need not address the supplementary arguments; the court already granted Central States' motion on two different, alternative grounds.