**Lonnie PATTERSON, Plaintiff–Appellant,**

v.

**CATERPILLAR, INCORPORATED, Defendant–Appellee.**

No. 95–1238.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 19, 1995.

Decided Nov. 21, 1995.

Rehearing Denied Dec. 21, 1995.

Joseph W. Weigel (argued), Eisenberg, Weigel, Carlson, Blau, Reitz & Clemens, Milwaukee, WI, for Plaintiff–Appellant.

Charles P. Stevens, Robert E. Schreiber, Jr. (argued), Lindner & Marsack, Milwaukee, WI, for Defendant–Appellee.

Before CUMMINGS, BAUER, and COFFEY, Circuit Judges.

BAUER, Circuit Judge.

Lonnie Patterson brought this action under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001–1461, seeking reinstatement of benefits that he had been receiving pursuant to Caterpillar's Monthly Disability Benefit Plan ("Plan"). Following a bench trial, the district court denied the reinstatement of benefits. Lonnie Patterson now appeals that judgment. In addition, Patterson challenges the district court's decision to allow the testimony of one of his treating physicians, despite Patterson's attempt to assert a physician-patient privilege. We affirm the judgment of the district court.

I. *Background Facts*

Because this case comes to us on appeal from a bench trial, we accept the district court's findings of fact unless they are clearly erroneous.

On February 9, 1967, Lonnie Patterson began a seventeen-year tenure with Caterpillar, Inc., in Milwaukee, Wisconsin. During that time, Patterson held a variety of jobs, culminating with the management position of Planning Staff Engineer. Patterson's employment came to an unfortunate end in March 1984, when he began a disability leave of absence after being diagnosed with multiple sclerosis.

Patterson began disability leave on March 16, 1984. He received his full salary for the first year of medical leave. Under Caterpillar's Disability Plan,

An employee will be considered totally disabled if he is not engaged in regular employment or occupation for remuneration or profit ... and if it is determined on the basis of medical evidence that such employee is totally disabled by bodily injury or disease so as to be prevented thereby from engaging in any regular occupation or employment with his employer.

Accordingly, as long as he was considered to be totally disabled, Patterson would receive $1,778.00 each month in income benefits, as well as full health care.

For the next five years, Patterson submitted medical information in order to continue receiving total disability benefits. During that time, Patterson was treated by a psychologist, Dr. Mary Alice Herzog, a neurologist, Dr. Charles Supapodok, and various general practitioners. The statements submitted to Caterpillar by these doctors indicated that Patterson should completely avoid most types of transportation and refrain from physical activity.

In 1989, Caterpillar began a general review of employees who were on disability leaves of absence. This review included an investigation of Patterson by Pinkerton Investigation Services ("Pinkerton"). Pinkerton's investigation produced ten months of surveillance tapes which indicated a much more active lifestyle than Patterson had de-

scribed to his doctors. But Caterpillar's review did not consist solely of videotape. In August, 1991, Dr. Paul B. Detweiler, a specialist in occupational medicine employed by Caterpillar, examined Patterson. After reviewing Patterson's file, which included letters and reports from Patterson's other physicians, and conducting the examination, Dr. Detweiler concluded that Patterson no longer met the Plan's standard for total disability. Gerald M. Burns, Supervisor of Disability Benefits in Caterpillar's Employee Benefits Division, considered the various medical opinions and surveillance materials, and agreed with Dr. Detweiler's assessment. Caterpillar accordingly advised Patterson that his disability status and benefits would be terminated effective August 28, 1991.

Patterson filed suit in state court in March 1992. Caterpillar removed the case to federal court and the district court held a bench trial from October 18–21, 1993. After reviewing the evidence and hearing testimony from various physicians and other individuals familiar with Patterson's level of disability, the district court awarded judgment in favor of Caterpillar.

## II. *Standard of Review*

■ We review conclusions of law *de novo*, and our review is governed by the same standards the district court employed in reviewing the Caterpillar Plan. *See Krawczyk v. Harnischfeger Corp.*, 41 F.3d 276, 278 (7th Cir.1994). The Supreme Court has held that deferential review is appropriate when the plan administrator is authorized to exercise discretion or to construe terms of the plan. *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 956, 103 L.Ed.2d 80 (1989); *Chalmers v. Quaker Oats Co.*, 61 F.3d 1340, 1343 (7th Cir.1995). The Caterpillar Plan provides that "benefits will be payable only upon receipt by the Insurance Carrier or Company of such notice and such due proof, as shall be from time to time required, of such disability." This language is similar to provisions that we previously have held sufficient to apply the arbitrary and capricious standard of review. *See Donato v. Metropolitan Life Ins., Co.*, 19 F.3d 375, 379 (7th Cir.1994);

*Bali v. Blue Cross & Blue Shield Ass'n*, 873 F.2d 1043, 1047 (7th Cir.1989). Because the Caterpillar Plan affords the administrator such discretion, we will reverse the district court only if Caterpillar's decision to terminate Patterson's disability benefits was arbitrary and capricious.

## III. *Analysis*

### A. Reinstatement of Benefits

■ In reviewing administrative action under the arbitrary and capricious standard, any questions of judgment are left to the agency, or here to the administrator of the Plan. *Pokratz v. Jones Dairy Farm*, 771 F.2d 206, 209 (7th Cir.1985), citing *Bowman Transportation, Inc. v. Arkansas–Best Freight System, Inc.*, 419 U.S. 281, 285–86, 95 S.Ct. 438, 441–42, 42 L.Ed.2d 447 (1974). Before concluding that a decision was arbitrary and capricious, a court must be very confident that the decisionmaker overlooked something important or seriously erred in appreciating the significance of the evidence. *Pokratz*, 771 F.2d at 209.

■ Patterson contends that Caterpillar did exactly that. He argues that in their efforts to terminate the disability benefits, Caterpillar officials failed to consider the medical opinions of Doctors Herzog and Supapodok or the annual reports of Doctors Steplejack and Danforth, two Caterpillar physicians who also had found Patterson to be totally disabled. Caterpillar did consider this information, but the reasonableness of their decision is best understood after considering the surveillance materials compiled by Pinkerton and the August 1991 examination by Dr. Detweiler.

The surveillance videotape and accompanying reports show that Patterson used his cane only when attending appointments with doctors or lawyers. Patterson switched the cane from hand to hand, and discarded it entirely while frequenting bars, restaurants, and the local racetrack. For example, the surveillance reports for February 4, 1991 show that following a doctor's appointment, Patterson went to a bowling alley, the bank, back home, the Mad Mule Bar, Chan–Trells Bar, and the Glass Slipper Bar, all without

bringing his cane. Patterson contends that the videotapes do not depict representative samples of his activities, but neither do the tapes indicate any symptoms of a loss of balance, a lack of coordination, or fatigue. Each of the doctors that reviewed the tapes concluded that Patterson was capable of working. In sum, the surveillance materials provide compelling evidence that Patterson was capable of more activity than he led his physicians to believe.

Videotapes alone, however, did not convince Caterpillar to terminate Patterson's benefits. In June 1991, Dr. Detweiler, a company physician who specializes in occupational medicine, indicated that there was not enough information to determine whether Patterson would be able to return to work. Pinkerton continued the surveillance, and Caterpillar arranged for Detweiler to examine Patterson on August 27, 1991. In the meantime, Detweiler familiarized himself with the requirements of Patterson's last position with the company. At the examination, Detweiler discussed Patterson's current medication and general medical condition. Although Detweiler did not conduct a full neurological examination, he tested Patterson's strength and reflexes, and observed him for any signs of weakness or fatigue. Following the examination, Detweiler informed Caterpillar that, in his opinion, Patterson was capable of performing a sedentary job.

The district court found that Detweiler's approach to his diagnosis was "cautious, careful, and thorough." We agree. The record indicates that Caterpillar did not ignore relevant information about Patterson's condition. Rather, the company merely found the information less persuasive in light of the surveillance materials and the more recent medical examination by Dr. Detweiler. We decline to second-guess that decision. The evidence available to Caterpillar in 1991 was sufficient to justify a decision that Patterson was no longer entitled to receive disability benefits under the Plan.

### B. Physician–Patient Privilege

■ Patterson's second argument is that the district court erred in allowing the testi-mony of Dr. Cass Terry, one of Patterson's treating physicians, despite Patterson's objection that Terry's testimony was privileged. In reviewing the district court's admission of allegedly privileged evidence, we apply the deferential abuse of discretion standard. *Raybestos Products Co. v. Younger*, 54 F.3d 1234, 1245 (7th Cir.1995); *see also Holmes v. Elgin, Joliet & Eastern Ry. Co.*, 18 F.3d 1393, 1397 (7th Cir.1994). The abuse of discretion standard is met only when the trial judge's "decision is based on an erroneous conclusion of law or where the record contains no evidence on which he rationally could have based that decision, or where the supposed facts found are clearly erroneous." *Wheeler v. Sims*, 951 F.2d 796, 802 (7th Cir.1992), citing *Deitchman v. E.R. Squibb & Sons, Inc.*, 740 F.2d 556, 563–64 (7th Cir. 1984).

■ Our review begins with Federal Rule of Evidence 501, which governs the applicability of privileges in federal courts. Rule 501 provides that the privilege of a witness

shall be governed by the principles of common law as they may be interpreted by the courts of the United States in the light of reason and experience. However, in civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the privilege of a witness, person, government, State, or political subdivision shall be determined in accordance with State law.

Fed.R.Evid. 501. Patterson relies on the last sentence of Rule 501 to argue that Dr. Terry's testimony should have been privileged according to Wisconsin state law. This argument fails for two reasons. First, Patterson's cause of action involves a federal question, namely a claim for benefits under a qualified ERISA plan. Consequently, federal common law supplies the applicable rules of privilege in this case. *See Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 56, 107 S.Ct. 1549, 1557, 95 L.Ed.2d 39 (1987) (noting Congress' expectation that a federal common law of rights and obligations under ERISA-regulated plans would develop). Unfortunately for Patterson, federal common law does not recognize a physician-patient privilege. *See*

*Whalen v. Roe,* 429 U.S. 589, 602 n. 28, 97 S.Ct. 869, 877 n. 28, 51 L.Ed.2d 64 (1977); *see also United States v. Bercier,* 848 F.2d 917, 920 (8th Cir.1988).

■ But our analysis need not end there. Even under Wisconsin state law, Patterson no longer can avail himself of the physician-patient privilege because none of Dr. Terry's testimony contained information covered by the privilege. The district court limited Dr. Terry's role at trial to expert testimony regarding the nature of multiple sclerosis and the information available to Caterpillar at the time it decided to terminate Patterson's benefits.[1]

Patterson contends that contacts between Caterpillar's counsel and Dr. Terry, as well as Caterpillar's calling Dr. Terry as a witness at trial, constitute *ex parte* communication sufficient to taint Dr. Terry's testimony. *State ex rel. Klieger v. Alby,* 125 Wis.2d 468, 469, 373 N.W.2d 57, 58 (Ct.App.1985). However, a recent Wisconsin Supreme Court decision, *Steinberg v. Jensen,* 194 Wis.2d 440, 534 N.W.2d 361, 370 (1995) holds to the contrary.[2] In *Steinberg,* one of plaintiff's treating physicians encountered the defendant in a hospital hallway and volunteered to testify as an expert on the defendant's behalf. The plaintiff asserted the physician-patient privilege to prevent the doctor's testimony. With respect to the privilege, the court held:

> Because its application is limited to judicial proceedings, the privilege does not prohibit defense counsel from engaging in *ex parte* communications with a plaintiff's treating physicians. Furthermore, under the privilege, a patient does not have the right to prevent his or her treating physicians from engaging in any conversation outside a judicial proceeding simply because confiden-

tial information could potentially be imparted.

*Id.* 534 N.W.2d at 370. Patterson's objection presents precisely this issue. Because Dr. Terry did not disclose confidential information about Patterson, he was free to speak with Caterpillar's counsel or to testify on its behalf.

## IV. *Conclusion*

For the foregoing reasons, we hold that Caterpillar's decision to terminate Patterson's benefits was neither arbitrary nor capricious, and was well within its discretion as administrator of the Plan. Moreover, we agree with the district court that the physician-patient privilege did not prohibit Dr. Terry's testimony. Accordingly, the decision of the district court is

AFFIRMED.

---

1. Although he was one of Patterson's treating physicians, Dr. Terry offered no testimony based on this physician-patient relationship. For example, with respect to the relative importance of a formal neurological examination in determining disability, Dr. Terry testified that 85 percent of the information can be derived through observation of the patient.

2. Prior case authority in Wisconsin suggests that *ex parte* communication with a plaintiff's treating

physician might implicate the physician-patient privilege. *See, e.g., Wikrent v. Toys "R" Us, Inc.,* 179 Wis.2d 297, 304, 507 N.W.2d 130 (Ct.App. 1993); *State ex rel. Klieger v. Alby,* 125 Wis.2d 468, 469, 373 N.W.2d 57, 58 (Ct.App.1985). Patterson cites these cases extensively in his brief. However, the Wisconsin Supreme Court in *Steinberg* expressly overruled *Wikrent, Klieger* and the cases applying it. *Steinberg,* 194 Wis.2d at 471, 534 N.W.2d 361.