**Faith WILCZYNSKI, Plaintiff,**

v.

**KEMPER NATIONAL INSURANCE COMPANIES, Defendant.**

No. 94 C 3146.

United States District Court, N.D. Illinois, Eastern Division.

March 23, 1998.

Mark D. DeBofsky, Alissa J. Camp, DeBofsky & DeBofsky, Chicago, IL, for Plaintiff.

Paul R. Garry, Robin Barish Edelstein, Bates, Meckler, Bulger & Tilson, Chicago, IL, for Defendant.

## OPINION AND ORDER

NORGLE, District Judge.

A bench trial was held in this matter from February 14, 1997, through February 24, 1997. After hearing the evidence and arguments at trial, the court enters the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52. As the issues in this matter have been tried and a decision has been rendered, judgment is entered in favor of Defendant, Kemper National Insurance Companies, and against Plaintiff, Faith Wilczynski, on all counts.

### I. FINDINGS OF FACT

A. *Faith Wilczynski's Work At Lumbermens Mutual Casualty Company*

1. The parties stipulated that Plaintiff, Faith Wilczynski ("Wilczynski"), was hired April 30, 1990, by Lumbermens Mutual Casualty Company ("Lumbermens"),[1] an insurance company, as a Commercial Lines Support Unit ("CLSU") Manager responsible for overseeing clerical units that included policy underwriting, rating and clerical support.[2]

2. After only working at Lumbermens for approximately five months on a full-time basis, Wilczynski informed her supervisor, Frank Kobel, in September 1990 that she had multiple sclerosis ("MS") and that her work hours had to be decreased. (Tr. at 311.)

3. Wilczynski submitted doctors' reports indicating that her hours may need to be

---

1. Lumbermens is one of a group of insurance companies which, at the time that the facts relevant to this proceeding occurred, operated under the trade name of Kemper National Insurance Companies.

2. Wilczynski worked in a modern air conditioned building with elevators that operated between floors so that Wilczynski was not required to walk up and down stairs to get from one floor to another. (Tr. at 310, 311.)

decreased based on her endurance level. (Tr. at 98, 312, D.Ex. 30 A–D.) Although her original position description was meant to be full-time, Frank Kobel ("Kobel") was informed by Kemper's Human Resource Department to make accommodations to allow Wilczynski to perform her job according to a flex-time work schedule. (Tr. at 348.) Wilczynski began working a reduced hour schedule in September 1990. (Tr. at 311.) Lumbermens always allowed Wilczynski to reduce her hours according to a doctor request.[3] (Tr. at 98, 99, 311, 312.)

4. For the remainder of the time she actively worked at Lumbermens, Wilczynski's duties were limited to what she could get accomplished during the time she was in the office. (Tr. at 303.) As such, her job responsibilities were adjusted to accommodate her restricted hours. (Tr. at 301–302, 313–314.)

5. In light of Faith Wilczynski's restricted hours, Kobel wanted Wilczynski to agree on what she would and would not do when she was in the office so that she could be held accountable for what was accomplished during the time she was at work. (Tr. at 318, D.Ex. 28.)

6. In 1991, Kobel met with Wilczynski on at least four occasions to agree on how her job would be performed based on her restricted hours. (Tr. at 320–330, D.Ex. 25, D.Ex. 29.)

7. Kobel and Wilczynski drafted a revised position description and performance standards which were presented to the Kemper Human Relations Department. Human Resource Manager, Vickie Laures ("Laures"), reminded Kobel to only evaluate Wilczynski on what she accomplished while working. In a memo from Laures to Kobel, she stated "[a]gain, when or how much she is at work is not our issue. What she does while she is at work and how we will hold her accountable is the issue." (Tr. at 331–336, D.Ex. 24, D.Ex. 26.)

8. From the period of September 1990, until July 11, 1991, Wilczynski worked for Lumbermens on a flex-time schedule which permitted her to leave work when she became fatigued. (Tr. at 42.) Wilczynski worked an average of five to six hours a day during these ten months, pacing herself according to how she felt at a given moment in time. (Tr. at 27, 95.)

9. Wilczynski admitted that she was never given a warning that she would be fired if she did not go back to work full-time. (Tr. at 29–33, 95–97, 331, 338.) In fact, Kobel's understanding was that Wilczynski would continue to work at her position on a flex-time schedule indefinitely. (Tr. at 339.)

10. Wilczynski went on a leave of absence on July 11, 1991, due to complications with a pregnancy. (Tr. at 44–45, 602.) Although Wilczynski left the work force on July 11, 1991, Lumbermens was prepared to continue to accommodate Wilczynski's flex-time schedule on a permanent basis. (Tr. at 339.)

11. While still on disability leave, Wilczynski was informed on October 29, 1991, that her CLSU Manager position was being eliminated due to business necessity but was offered a rating position with the company. (Tr. at 344–346.) Although Wilczynski indicated that it was doubtful she would accept the rating position, Lumbermens held the position open for three to four months in the event she changed her mind. (Tr. at 345, 346.)

12. From July 11, 1991, until March 1992, Wilczynski claimed total disability due first to the pregnancy and then to a kidney problem.[4] In April 1992, Wilczynski began to claim that she was disabled from working due to a worsening case of multiple sclerosis. She never attempted to return to work at Lumbermens.

B. *Long Term Disability Benefits Under The Kemper Plan*

13. As a Lumbermens' employee, Wilczynski exercised her right to purchase long

---

3. For example, after Wilczynski presented a doctor's note in March 1991, she was able to come in between 10:00 a.m. and 12:00 p.m. and leave when fatigued. (Tr. at 212, D.Ex. 30–D.)

4. Wilczynski gave birth to a healthy child on or about February 29, 1992, but remained out on disability leave. (Tr. at 603.)

term disability insurance from the Kemper National Insurance Companies' Long Term Disability Plan ("Kemper Plan").[5] The Kemper Plan, in effect in July 1991, provided benefits for participating employees of Lumbermens for disabilities resulting from injury or sickness. (Tr. at 595, 596, D.Ex. 1.)

14. Under the Kemper Plan, the standard for eligibility to receive long term disability benefits during the first 24 months that benefits are payable is that the employee is "unable to perform each of the material and substantial duties of his work with [Lumbermens]." (D.Ex.1.) The standard for eligibility to continue receiving long term disability benefits after the first 24 months that benefits are payable is that the employee is "unable to perform each of the material and substantial duties of any employment for which [the employee is] reasonably fitted by education, training or experience."[6] (D.Ex.1.)

15. Under the Kemper Plan, an employee is eligible to receive long term disability benefits after a 13-week elimination period. (Tr. at 597.) In order to receive benefits, "[a] claim form provided by the Company must be completed and returned to the employee group claim department prior to receiving any benefit payment under the Plan." (P.Ex. 1, D.Ex.1.) The Kemper Plan also specifies that "[t]he Company may require confirmation of a continuing disability at reasonable intervals through submission of a new form" and that independent examinations may be required to determine validity of a claim. (P.Ex. 1, D.Ex.1.)

16. From 1991 through 1993, Lumbermens' Employee Claim Department administered claims for long term disability benefits under the Kemper Plan. (Tr. at 594.) During this period of time, Deborah Bierwirth was a technical supervisor in the Employee Claim Department responsible for adminis-

tering disability claims, including the claims of Wilczynski. (Tr. at 595, 600, 601, 652.)

17. The Employee Claim Department interpreted the term "work" under the Kemper Plan's occupational disability clause as what the employee was doing at the time of disability. (Tr. at 599, 654, 655.) This would be accomplished by looking at both the position description and the information filled out by an employee's supervisor on an occupational analysis form to determine what the employee's work was at the time of the disability. (Tr. at 599, 654.)

C. *Faith Wilczynski's Disability Benefits*

18. Wilczynski submitted forms to the Employee Claim Department in an effort to certify her disability from July 1991 forward. (Tr. at 45, 46.)

19. As already noted, beginning in or around April 1992, the Employee Claim Department began receiving forms from physicians stating that Wilczynski was totally disabled due to multiple sclerosis ("MS").[7] (Tr. at 602, 603.) Specifically, in April 1992, the Employee Claim Department received information from a Dr. Timothy Martin advising that Wilczynski was disabled from working due to MS. (Tr. at 603, 604.)

20. Pursuant to the Kemper Plan, Wilczynski was asked to submit to an independent medical examination ("IME") to substantiate her alleged disability. (Tr. at 604, 605.) The Employee Claim Department retained the services of a medical case management service, Crawford & Company, to select a doctor to perform the independent medical examination ("IME"). (Tr. at 604, 605.) Crawford & Company selected Dr. Daniel Hier, then Chairman of the Department of Neurology of the University of Illinois Hospital. (Tr. at 123, 605, 606.)

---

5. A summary plan description explains to employees in layman's terms the provisions of the Kemper Plan. (Tr. at 653, 654.) However, "[i]f there is a difference between what is stated in [the] summary description and what is stated in the plan document, the terms of the [Kemper Plan] will govern." (Tr. at 689, P.Ex. 1.)

6. For ease of reference, the disability definition for the first 24 months will be referred to herein

as the "occupational disability clause." The disability definition for the period after the first 24 months will be referred to herein as the "general disability clause."

7. Although Wilczynski believes she was diagnosed with MS in 1987, *no medical evidence was presented that confirmed such a diagnosis at that time.* (Tr. at 11–13, 90, 91.)

21. Dr. Hier performed an IME on Wilczynski in September 1992. (Tr. at 115, 120, 606.) After the examination, Dr. Hier submitted a report to the Employee Claim Department stating that Wilczynski was not disabled due to MS. (Tr. at 120, 606–608, D.Ex. 33.)

22. The Employee Claim Department then sent Wilczynski's current treating physician, Dr. Timothy Martin, a copy of Dr. Hier's report to inquire whether he agreed with Dr. Hier's conclusions. (Tr. at 608.) In November 1992, the Employee Claim Department received written confirmation from Dr. Martin that he agreed with Dr. Hier's opinion that the diagnosis of MS was uncertain and that he was no longer going to certify Wilczynski as disabled. (Tr. at 608–611, D.Ex. 44.)

23. Even though her treating physician and an independent physician both concurred she was not disabled due to MS, the Employee Claim Department did not terminate Wilczynski's disability benefits at this time because Wilczynski stated that she was now being treated by a new physician, Dr. Geiger. (Tr. at 614.) Dr. Geiger sent a form to the Employee Claim Department stating Wilczynski was "disabled through indefinitely because of MS. . . . " As a result of Dr. Geiger's assessment, the Employee Claims Department sought a second IME to try and clear up the confusion. (Tr. at 615.)

24. Crawford & Company selected Dr. Bruce Cohen of Northwestern Memorial Hospital to perform the exam. (Tr. at 616.) Wilczynski was examined by Dr. Cohen in January 1993. (Tr. at 124, 127, 616.) Dr. Cohen submitted a report detailing the results of his exam which concluded that Wilczynski could perform "continued occupational activity" on an adjusted level. (Tr. at 616, 617, D.Ex. 34 at p. 6.) The adjustment to which Dr. Cohen refers to in his report is rest periods during the day—something Lumbermens had already been providing to Wilczynski for the ten months prior to the time she went out on disability leave. (D.Ex.34.)

25. At this point in time, Bierwirth recommended to her manager, Kathy Krautwurst, that Wilczynski's benefits should be terminated based upon the opinion of her treating doctor and the two doctors that performed independent medical exams that she was not disabled from working. (Tr. at 617, 618.) However, Krautwurst suggested that prior to making such a determination, a medical case manager should be retained to help facilitate a return to work for Wilczynski. (Tr. at 620, 621.)

26. During this same time period, Dr. Geiger, who had been certifying Wilczynski's disability forms, informed the Employee Claim Department in January 1993 that he was neither a neurologist nor an expert on MS, and had recommended to Wilczynski that she should be seen by a neurologist. (Tr. at 622.) Subsequent to Dr. Geiger's letter, Wilczynski, according to her own testimony, began to "doctor shop." (Tr. at 114.)

27. Accordingly, Wilczynski informed the Employee Claim Department that a Dr. Markovitz would be certifying her disability. (Tr. at 622.) Shortly thereafter, Wilczynski switched from Dr. Markovitz to a Dr. Zelkowitz. (Tr. at 623–624, 627.) Neither Dr. Markovitz nor Dr. Zelkowitz ever submitted a report to the Employee Claim Department detailing their examination of Wilczynski, even though this information had been requested from both doctors.[8] (Tr. at 628–629, 630.) Both of these treating doctors only saw Wilczynski one time. (Tr. at 51, 52.)

28. In April 1993, Wilczynski informed the Employee Claim Department that she now had selected a third doctor, Dr. Kloman, as her new treating physician. (Tr. at 627, 628.) Dr. Kloman was not a board certified neurologist in 1993. (P.Ex. 2 at p. 58, 59.) Dr. Kloman certified Wilczynski as being disabled due to MS in April 1993. His primary basis for determining that Wilczynski was disabled was that (1) her multiple sclerosis caused her to become extremely fatigued;

8. The Employee Claim Department also sent Dr. Zelkowitz the IME reports from Dr. Cohen and Dr. Hier and asked him to comment on them. (Tr. at 630.) Dr. Zelkowitz informed the Employee Claim Department that he had only seen Wilczynski one time and could not comment on her disability status. (Tr. at 630.)

and (2) her multiple sclerosis caused Wilczynski to have problems with her balance. (P.Ex. 2 at p. 70, 71 and Kloman Deposition Exhibit 4.)[9] At that time, the Employee Claim Department requested that Dr. Kloman fill out a functional capacity evaluation form regarding Wilczynski's functional capacities. (Tr. at 631, 632.) Between May 1993 and November 1993, the Employee Claim Department did not receive any medical information from any doctor about Wilczynski or any confirmation that she had been examined by any doctor during that time period. (Tr. at 632, 633.) Wilczynski continued to receive disability benefits during this time.

29. April 1993 was the first and last time that Dr. Kloman physically examined Wilczynski in 1993. (P.Ex. 2 at p. 88.) After this evaluation, Kloman's treatment of Wilczynski in 1993 was limited to telephone conversations. (Tr. at 169, 224–225.) Kloman never conducted any diagnostic tests on Wilczynski in 1993, and Kloman never prescribed any medication for Wilczynski in 1993. (Tr. at 164, P.Ex. 2 at p. 63–66.) Additionally, she was using no ambulatory devices of any kind to help her with her alleged balance problem.[10]

30. In July 1993, Wilczynski was asked to undergo a third IME because she was within six months of reaching the Kemper Plan's second definition, the "general disability clause," of a long term disability. (Tr. at 633.) It was the practice of the Employee Claim Department to have a claimant undergo an IME before the second definition became applicable to his/her claim. (Tr. at 633.) The Employee Claim Department retained Ellis & Associates in July 1993 to select a doctor for the third IME. (Tr. at 127, 635.) The doctor selected by Ellis & Associ-

ates was Dr. Michael Wasserman, a board certified neurologist. (Tr. at 127, 365, 636, D.Ex. 39.)

31. Dr. Wasserman saw Wilczynski on September 7, 1993, and then on November 2, 1993. (Tr. at 127, 128, 366, 369.) Dr. Wasserman performed a thorough physical examination on Wilczynski during her first visit on September 7, 1993. (Tr. at 369.) Dr. Wasserman testified, based on that examination, that there were no objective findings for the disabling fatigue that Wilczynski claimed was the primary reason she could not work; nor did he find any objective evidence of the serious balance problems she claimed to experience. (Tr. at 408.)

32. The only findings that were not normal during his examination of Wilczynski were those tests that could be manipulated by the patient. (Tr. at 394, D.Ex. 35.) Dr. Wasserman also testified that he reviewed the results of two spinal taps that had been done on Wilczynski prior to his examination. He stated that these tests were also normal except for the presence of oligoclonal bands which could easily be seen for several other conditions other than MS. (Tr. at 394, 395, 397–400.) Finally, Dr. Wasserman testified that he reviewed a normal MRI test of Wilczynski's brain and noted that in approximately 95 percent of the individuals who have MS, an MRI scan will show an abnormality. (Tr. at 395, 396.)

33. As a part of his meeting with Wilczynski, Dr. Wasserman reviewed her position description and the Occupational Planning Analysis Worksheet that was filled out by her supervisor, Frank Kobel.[11] (D.Ex.35.) Taking into account Wilczynski's disagreements with her supervisor's assessment of

9. Although Wilczynski also claimed to experience some urinary incontinence, she testified it did not require her to be under a course of treatment or on any medication between 1991 and 1993. (Tr. at 112.)

10. Significantly, Wilczynski testified that from February 1992 and throughout 1993 she lived in a two-story house with her baby's room on the second floor. (Tr. at 108–110.) Wilczynski testified that she was responsible for taking care of her baby on a regular basis from 2:00 p.m. until 11:00 p.m. which included taking her baby up and down the stairs. (Tr. at 108–110.) Although

Wilczynski testified that she fell on several occasions, she testified that she did not at any time install grab bars in any part of her house or ever use an ambulatory device like a cane to help prevent her from falling. (Tr. at 108, 109, 190–193, 213, 214.)

11. Although Wilczynski told Dr. Wasserman during her examination "that stairs are a significant portion of her work," she testified that an elevator was available to get between floors. (Tr. at 146, D.Ex. 35.)

the requirements for the position, Dr. Wasserman stated that based on his examination, Wilczynski could return to work on a full-time basis. (Tr. at 404–406.)

34. Dr. Wasserman prepared a report on his evaluation of Wilczynski's condition. (D.Ex.35.) The Employee Claim Department received Dr. Wasserman's report on November 18, 1993. (Tr. at 405, 406, 411, D.Ex. 35.) He did not actually submit the report until November of 1993 because he had requested Wilczynski complete some tests and wanted to see the results before he wrote a report.[12] (Tr. at 367–369, 405, 406, 411, 636, 637, D.Ex. 35.)

35. On November 20, 1993, the Employee Claim Department also finally received the functional capacities form filled out by Dr. Kloman on or about November 16, 1993. (Tr. at 638, 639, 640, D.Ex. 35.) In this form, Dr. Kloman was now of the opinion that Wilczynski was not totally disabled but that she could work at least five hours per day, with rest intervals. (Tr. at 638–640, D.Ex. 10.) Dr. Kloman issued this opinion without having physically examined Wilczynski since April 1993.

36. By November 1993, the Employee Claim Department had been informed by three different, board certified neurologists who had performed IMEs on Wilczynski that she could work at least part-time. Further, the most recent IME from Dr. Wasserman indicated that there was no objective evidence that Wilczynski was suffering from any disabling condition.

37. Based on this information, Bierwirth and Krautwurst discussed the fact that Wilczynski was no longer eligible to receive disability benefits under the first definition of the Kemper Plan because she was at the

very least able to return to the same flex-time work schedule she had been doing for ten months prior to going out on disability.[13] (Tr. at 641, 642.) There was also no need to provide rehabilitation services to Wilczynski because she was able to return to the work she had been performing before being disabled from working. (Tr. at 692–694.)

38. The Employee Claim Department then contacted the Human Resources Department on December 1, 1993, to see if Lumbermens would accommodate Wilczynski's flex-time work restrictions as recommended by the doctors if her prior position was available. (Tr. at 642, P.Ex. 3 at K000492.) The Human Resources Department indicated that as such accommodations had in fact been made for Wilczynski before she went on leave, the company could make those same accommodations again. Based on all the evidence before them, Bierwirth and Krautwurst decided that on December 2, 1993, that Wilczynski was no longer eligible for long term disability benefits.[14] (Tr. at 645.)

39. On December 2, 1993, Wilczynski was notified that her long term disability benefits were being terminated and she had the right to request a review of the decision. (Tr. at 53, 54, 645, 646, P.Ex. 4.) At the time Wilczynski's disability benefits terminated, she remained a Lumbermens employee for 30 days as Lumbermens searched for another job for her in her old office. No jobs were available in that office and she was then terminated as an employee on January 3, 1994.

D. *Appeal Policy In Effect In Late 1993/Early 1994*

40. In late 1993 and early 1994, there were three levels of appeal that an employee

---

12. Dr. Wasserman wanted Wilczynski to have another MRI test and an evoked response test, which is another test used to help diagnose MS. (Tr. at 128, 129, 368, 369.) Wilczynski refused to have an MRI because she was pregnant at the time but did take the evoked response test which was reported normal. (Tr. at 129, 368, 369.)

13. While Faith Wilczynski was out on disability, the Employee Claim Department instructed her supervisor, Frank Kobel, to fill out an Occupational Planning Analysis Worksheet as her CLSU Manager position was initially intended to be which was full-time, but to indicate on the form

that Wilczynski actually worked at her position for almost a year on a reduced hour basis. (Tr. at 295, 308, 391.)

14. The fact that at the time that the Employee Claim Department made its determination Wilczynski's job had been eliminated is of no consequence. The Kemper Plan did not require that Wilczynski's job still be open. It only required a determination that, at the termination of benefits, Wilczynski was able to perform her job as it was constructed when she left it. (Tr. at 643.)

could request a review of the termination of his/her disability benefits. (Tr. at 699.) An employee may submit additional information and/or documentation at any level of the review process. (Tr. at 702.)

41. At the first level of appeal, the review was conducted by the employee claim manager, then George Dion, who would send out a letter to the employee stating the result of the first level review. (Tr. at 699.) The letter stated that if an employee was not satisfied with the first level response, he/she could request a second level review. (Tr. at 699.)

42. Requests for the second level review were directed to Sally Bullen, who in late 1993 was the Director of Compensation and Benefits. (Tr. at 699.) Bullen would then coordinate the process of gathering information from the claim file for the two individuals who, in addition to herself, were responsible at that time for the second level review. (Tr. at 699, 700.) These other two individuals were Dave Sullivan, Senior Vice President of Claim, and Fred McCullough, Vice President of Administration. (Tr. at 700.)

43. In gathering information for the second level review, Bullen would notify the Employee Claim Department that a second level review was requested and to provide her with the claim file. (Tr. at 700.) Then Bullen would give the claim file, and any additional information the employee requesting the review had provided, to Dave Sullivan to review. (Tr. at 700.) Sullivan would indicate on a form whether he agreed or disagreed with the decision from the first review. (Tr. at 700.) After Bullen reviewed the file, she would give the file to McCullough to review. (Tr. at 700, 701.) If both Sullivan and McCullough agreed with the first level review decision, a letter would be sent to the employee explaining the decision of the second level review. (Tr. at 701.) The letter also informed the employee that he/she had the right to a third and final review which had to be requested in writing within 60 days. (Tr. at 701.)

44. At the final appeal level, all the documents in the file that had been considered during the first and second level reviews and any additional information supplied by the employee would be considered by a committee during this final review. (Tr. at 701, 702 .) The third level appeal committee consisted of Sullivan, McCullough, and Lumbermens' general counsel, John Conway. (Tr. at 701, 702.)

E. *Review Of The Termination Of Faith Wilczynski's Long–Term Disability Benefits*

45. Wilczynski timely appealed the decision to terminate her disability benefits. (Tr. at 54, 147, 148.) In a letter dated January 3, 1994, Lumbermens' Employee Claim Department informed Wilczynski that the outcome of the first level review of her claim was to uphold the decision to terminate her benefits. (Tr. at 54, 147, 148, 703, D.Ex. 10.)

46. Wilczynski also participated in a second level review that was provided for in the January 3, 1994, letter. (Tr. at 54, 147, 148, D.Ex. 10.) In response to Wilczynski's second level review, a letter was sent to Wilczynski on March 11, 1994, stating that the decision to terminate her long term disability benefits was upheld. (Tr. at 54, 148, 149, 703, 704, D.Ex. 11.) The letter contained the reasons for denying benefits, i.e., the IME reports, and that a third and final level of review could be requested in writing within 60 days. (Tr. at 148–150, 706, 712–715, D.Ex. 11.)

47. Wilczynski did not submit any additional documentation either at the first or second level of the review of the termination of her disability benefits. (Tr. at 648, 649, 704, 705.) Other than a written statement of her own, Wilczynski did not submit (1) any vocational evidence that she was unemployable in 1993; (2) any additional medical information; or (3) any affidavits from her husband, friends relatives or other persons to support her claim of fatigue or that her disability benefits should be reinstated for any other reason. (Tr. at 705.)

48. On April 11, 1994, Mark DeBofsky, an attorney, sent a letter to Kemper National Insurance Companies stating that Wilczynski had retained him to represent her in her third and final review of the decision to terminate her disability benefits. (Tr. at 151,

152, 706, D.Ex. 12.) In the April 11, 1994, letter, DeBofsky demanded the "complete contents" of Wilczynski's disability claim file to allegedly prepare for Wilczynski's final appeal. (D.Ex.12.)

49. In response to the letter, Kemper National Insurance Companies' in-house counsel, Gerald Pluard, explained to DeBofsky that he would provide DeBofsky the opportunity to review the pertinent documents relied upon in the decision to terminate Wilczynski's disability benefits pursuant to ERISA, but that he would not turn over the entire contents of the claim file. (Tr. at 728–732, D.Ex. 12.) Pluard informed DeBofsky that the pertinent documents were his client's medical records to which he had access and the three independent medical exams which Pluard offered to provide to De-Bofsky. (Tr. at 731.)

50. On April 27, 1994, DeBofsky sent a letter stating "unless we have the entire claim file by Monday, May 2, we will consider all administrative appeal efforts futile and exhausted and will proceed to Federal Court." (Tr. at 732, 733, P.Ex. 27.)

51. On May 24, 1994, Pluard faxed De-Bofsky a cover letter and a copy of the reports of the three neurological specialists who performed independent medical examinations of Wilczynski. (Tr. at 736–738, D.Ex. 13, D.Ex. 33, D.Ex. 34, D.Ex. 35.) The May 24, 1994, letter also provided Wilczynski additional time, until July 25, 1994, to perfect her third and final administrative appeal. (Tr. at 736, 737, D.Ex. 13.) That same day DeBofsky faxed Pluard a letter stating that the information provided was insufficient and repeated his demand to review the complete claim file. (Tr. at 739, D.Ex. 14.)

52. Shortly after these letters were exchanged, Pluard and DeBofsky engaged in a series of telephone conversations and letters in which Pluard invited DeBofsky to come to Pluard's office and go through the claim file at which time they would mutually agree on what were the pertinent documents. (Tr. at 740–745, 775.) DeBofsky refused to come out and review the content of the files because Pluard would not agree to provide him with all documents pertaining to Wilczynski.

(Tr. at 740–745, 749–750, 775, 777, 781, D. Exs. 15, 16, 17.)

53. Prior to July 25, 1994, the date the third review had to be filed, DeBofsky did not take advantage of the offer to review documents, and did not request any further extensions. (Tr. at 781, 782.) DeBofsky did not, on behalf of Wilczynski, submit a third and final review by the July 25, 1994, deadline. (Tr. at 706, 747.)

### F. *Wilczynski Failed To Timely Elect COBRA Coverage*

54. The parties stipulated that: Wilczynski participated in a health insurance plan for Lumbermens' employees. When her employment with Lumbermens ended on January 3, 1994, this constituted a qualifying event which entitled her to elect to continue her health insurance, at her own expense, under the COBRA amendments to ERISA, 29 U.S.C. § 1161 *et seq.*

55. On March 21, 1994, CobraServ, an independent company retained by Lumbermens to administer its COBRA program, sent a notice to Wilczynski which she received on March 25, 1994, informing her that in order to continue her health insurance, she would be required to send a written COBRA election form to CobraServ by May 20, 1994. (Tr. at 59, 62, 63, 141, D.Ex. 18.) The notice included an information sheet stating:

"THE ENCLOSED ELECTION AGREEMENT MUST BE COMPLETED, SIGNED AND SENT TO COBRA-SERV WITHIN 60 DAYS OF THE DATE COVERAGE TERMINATES OR THE DATE OF THE ENCLOSED IMPORTANT NOTICE (WHICHEVER IS LATER). IF A QUALIFIED BENEFICIARY DOES NOT SEND THIS ELECTION WITHIN THE 60–DAY TIME PERIOD ALLOWED BY LAW, THE QUALIFIED BENEFICIARY WILL LOSE RIGHTS TO CONTINUE COVERAGE."

(D.Ex.18.)

56. Wilczynski testified that she knew she had to elect COBRA continuation coverage in writing by May 20, 1994. (Tr. at 132, 141, 142.) According to Wilczynski, she did not

personally mail the election form but gave it to her husband to mail prior to the expiration date. (Tr. at 60, 61, 142.). Wilczynski's husband, Paul Wilczynski, testified that he mailed the letter. (Tr. at 234–236.) However, neither he nor his wife told CobraServ or other decision-makers, at any time in which Wilczynski was seeking review of the denial of her COBRA medical insurance benefits, of this alleged fact and so his testimony is disregarded. (Tr. at 234–236.)

57. Although Wilczynski claimed she was concerned about having health insurance coverage due to the forthcoming delivery of her baby, (Tr. at 61, 65), she did not have the election form sent back to CobraServ by certified mail which she did testify doing for other important documents. For example, Wilczynski testified that when she was denied her disability benefits, she filed an appeal of those disability benefits and sent the appeal by certified mail. (Tr. at 129 and 130.) She also applied to the Social Security Administration for disability benefits and sent the information to the Social Security Administration by certified mail. (Tr. at 130.)

58. On May 20, 1994, Wilczynski claims she had a telephone conversation with an undisclosed individual at CobraServ who informed Wilczynski that her written election form had not been received. (Tr. at 64, 65, 130–133, 140, 141.) After hearing this information on the telephone, Wilczynski did not send a fax or send a telegram to CobraServ indicating that she indeed was electing COBRA benefits so as to notify CobraServ on a timely basis. (Tr. at 132, 133.) Since CobraServ did not receive a written election within the 60–day time period allowed by law, Wilczynski was informed that she would not receive the benefit of COBRA continuation medical insurance.

59. Wilczynski appealed the denial of her COBRA coverage. (Tr. at 137, 138, 143.) At no time during any appeal process did she submit information, either through affidavit or some other document, indicating that her husband had in fact mailed the election form. (Tr. at 137, 142–144.) Instead she claimed that she had in fact mailed the form. (Tr. at 59–61.)

60. After thoroughly reviewing its records, CobraServ wrote Wilczynski a letter confirming the fact that she was not eligible for COBRA continuation coverage "because [CobraServ] did not receive [her] election within the 60–day time period allowed by law." (D.Ex.19.)

## II. CONCLUSIONS OF LAW

61. This matter arises under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.* (ERISA), and constitutes a claim for employee welfare benefits which may be brought pursuant to 29 U.S.C. § 1132(a)(1)(B). There are three issues raised by the case here. First, was the denial of Wilczynski's disability benefits violative of ERISA? Second, was Wilczynski's disability claim barred by her failure to exhaust the Kemper Plan's appeal process? Third, was the denial of Wilczynski's request for COBRA benefits violative of ERISA?

### A. *The Decision To Terminate Wilczynski's Benefits Was Reasonable*

62. Under ERISA, the decision of a plan administrator to terminate benefits is subject only to an arbitrary and capricious standard of review provided that the plan grants the plan administrator discretion in making such determinations. *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989); *Patterson v. Caterpillar,* 70 F.3d 503 (7th Cir.1995). The language in an employee benefit plan need not contain an explicit grant of discretionary authority in order for an arbitrary and capricious standard of review to apply. *Patterson,* 70 F.3d at 505; *Bali v. Blue Cross & Blue Shield Ass'n,* 873 F.2d 1043, 1047 (7th Cir.1989).

63. In *Patterson,* 70 F.3d at 505, the court found that the following provision provided the plan administrator sufficient discretion to apply the arbitrary and capricious standard of review:

"Benefits will be payable only upon receipt by the Insurance Carrier or Company of such notice and such due proof, as shall be from time to time required, of such disability."

64. In the instant case, the "Proof of Claim" section of the Kemper Plan provides language of identical significance to that in *Patterson*. "A claim form provided by the Company must be completed and returned to the employee group claim department prior to receiving any benefit payment under the Plan" and "[t]he Company may require confirmation of a continuing disability at reasonable intervals through submission of a new form." (P.Ex. 1, D .Ex. 1.) The Kemper Plan also specifies that independent examinations may be required to determine the validity of a claim.

65. As the Kemper Plan reserves for the plan administrator discretion similar to that preserved for the Caterpillar plan administrator under controlling Seventh Circuit precedent, *Patterson*, 70 F.3d at 505, an arbitrary and capricious, standard of review should be applied in this case.

66. The court also finds that there is no evidence of a conflict of interest between the Kemper Plan and the Employee Claims Department of Lumbermens which administered the program. The Kemper Plan is funded fully by the employees who participate in it. (Tr. at 747–748.) As Lumbermens is not involved in the funding of the plan, it has no economic interest in whether Wilczynski receives her benefits or not, and thus no conflict exists. *See Chalmers v. Quaker Oats Co.*, 61 F.3d 1340, 1343 (7th Cir.1995). Even if a conflict of interest does exist, since the Kemper Plan affords the administrator discretion in determining benefits, the standard of review remains the arbitrary and capricious standard. *Donato v. Metropolitan Life Ins. Co.*, 19 F.3d 375 (7th Cir.1994).

67. Where an arbitrary and capricious standard is used, the court may consider only those materials presented to the plan administrator. *Donato v. Metropolitan Life Ins. Co.*, 19 F.3d 375, 380 (7th Cir.1994) (*quoting*

*Fuller v. CBT Corp.*, 905 F.2d 1055, 1058 (7th Cir.1990)). Further the court must give substantial deference to the plan administrator's determination. *Id.* The plan administrator's determination must be upheld unless it is "downright unreasonable." *Id.* It does not matter whether the decisionmaker's interpretation of the evidence was actually correct, but whether their interpretation was reasonable. *Cvelbar v. CBI Illinois Inc.*, 106 F.3d 1368, 1378 (7th Cir.1997).

68. Thus, "[b]efore concluding that a decision was arbitrary and capricious, a court must be very confident that the decisionmaker overlooked something important or seriously erred in appreciating the significance of evidence." *Central States, Southeast v. Gateway Foods of Twin Ports, Inc.*, 951 F.Supp. 732, 736 (N.D.Ill.1996) (*quoting Wahlin v. Sears, Roebuck & Co.*, 78 F.3d 1232, 1235 (7th Cir.1996)). As stated in *Pokratz v. Jones Dairy Farm*, 771 F.2d 206, 209 (7th Cir.1985), "a decision is not arbitrary and capricious when a court can review reasons stated for the decision without a loud guffaw."

69. The termination of Wilczynski's benefits was deemed effective as of September 6, 1993. The two year period from her initial receipt of long term disability benefits ended on October 11, 1993. Accordingly, Wilczynski fell within the Kemper Plan's first definition of total disability, the occupational disability clause, which provides that if a claimant could perform his or her "work," then the claimant is not disabled.[15] (D.Ex.1.)

70. Wilczynski's work was not the full-time CLSU Manager position she was hired to perform, but the flex-time CLSU Manager position that she was performing for the ten months prior to her disability leave. An ERISA claimant's regular duties are not that for which the claimant was

---

15. Because Wilczynski's request for a review of the termination of her benefits involved only her right to disability benefits under the occupational disability clause, the issue of whether Wilczynski was entitled to an award of disability benefits under the second definition contained in the Kemper Plan was not properly before the court. *Saffle v. Sierra Pacific Power Co.*, 85 F.3d (9th

Cir.1996). Additionally, during the trial, Wilczynski made a proffer regarding her present condition which was considered by the court. (Tr. at 520–559.) In light of the fact that the issue before the court was whether the decision to terminate her benefits in December 1993 was proper, the court restricted the evidence to the relevant time period.

originally hired, but the duties that the claimant was actually performing. *Goldstein v. Group Ins. Plan for Admin. & Management Employees of Fairchild Republic Co.*, 940 F.Supp. 474, 478 (E.D.N.Y.1995), *aff'd*, 99 F.3d 101 (2d Cir.1996). In further support of this conclusion, the court notes that of the fifteen months that Wilczynski actually worked for Lumbermens, she worked the flex-time CLSU Manager position for ten of those fifteen months.

71. Based on the evidence both sides presented to the court, it was not arbitrary or capricious for the Employee Claim Department to determine that Wilczynski was not disabled under the occupational disability clause of the Kemper Plan as of September 1993. As admitted in the uncontested facts submitted as part of the Final Pretrial Order and during the trial, Wilczynski worked at her job as CLSU Manager on a flex-time schedule, which permitted her to rest or leave work when she was fatigued, for most of her employment with Lumbermens and continuously for the last 10 months of her employment. Lumbermens was prepared to have Wilczynski continue to work as a CLSU Manager under those terms and conditions indefinitely and the evidence showed that prior to going out on leave, her formal job description and performance standards were in the process of being revised to reflect that fact.

■ 72. The medical evidence which was relied upon in making the decision to terminate Wilczynski's benefits as of September 1993 made it clear that as of September 1993 Wilczynski was able to return to the work she was performing before she went on disability leave.

73. The court finds that Lumbermens' Employee Claim Department acted with restraint and came to this resolution only after a full consideration of all issues surrounding Wilczynski's alleged medical condition. Lumbermens' Employee Claim Department retained the services of outside medical case managers to select doctors for the IMEs. It did not terminate her benefits until three independent medical examiners, Dr. Hier, Dr. Cohen and Dr. Wasserman, all indicated that Wilczynski could work continuously as a CLSU Manager in a flex-time environment.

74. The court finds particularly persuasive the medical examination of Dr. Wasserman which took place in September 1993 to which he testified in this proceeding. The court finds that Dr. Wasserman's testimony was credible. The evidence shows that Dr. Wasserman had no relationship with the Defendant prior to this assignment. The evidence also shows he had no long standing relationship with the third party, Ellis & Associates, who selected him, or that providing IME assessments was a significant part of his income. (Tr. at 364–366.) Dr. Wasserman conducted what appears to the court to be a full examination of Wilczynski; the fact that he could find absolutely no objective evidence that Wilczynski was suffering from multiple sclerosis or any other disabling condition convinces the court that Lumbermens did not act arbitrarily or capriciously in denying Wilczynski continuing disability payments after receiving his report.

■ 75. At the time the decision was made to deny future disability benefits to Wilczynski, there was little credible, contrary evidence supporting Wilczynski's claim that she was still totally disabled. Shortly before her disability benefits terminated, Wilczynski's own treating physician, Dr. Kloman, stated in a "functional capacities form" dated November 16, 1993, that she was able to work five hours a day with rest intervals. While Dr. Kloman also stated in another report dated November 9, 1993, that Wilczynski could only come to work one to two days a week, it was not arbitrary or capricious to give minimal weight to Dr. Kloman's evaluation where he offered inconsistent opinions and where, as here, he had not physically examined Wilczynski since April 1993.

76. Wilczynski contends that controlling weight must always be given to the treating physician's opinion. Wilczynski is wrong. To the extent that any of Dr. Kloman's medical evaluation deviated from the opinion of the independent medical examiners, it was not error for the plan administrator not to give controlling weight to a treating physician's opinion. *See Donato v. Metropolitan*

*Life Ins. Co.,* 19 F.3d 375, 382 (7th Cir.1994); *Royster v. Metropolitan Life Ins. Co.,* No. 94 C 7563, 1996 WL 587546, at *6 (N.D.Ill. Oct. 8, 1996) (J. Norgle) (citations therein). Where "a plan administrator adopts one of multiple competing medical opinions, absent evidence suggesting incompetence of the chosen opinion, its action is not arbitrary," *Royster,* 1996 WL 587546, at *6. In this case, given the conflicting evaluations of Wilczynski by Dr. Kloman and his limited contact with Wilczynski, it was not arbitrary for Lumbermens to choose not to follow his report.

77. Additionally, the court finds support for the Employee Claim Department's determination to terminate Wilczynski's benefits based on Wilczynski's own testimony that in 1993 she was not taking medication for her alleged fatigue, and that she was walking and standing without the assistance of any ambulatory device. Those facts were particularly significant because Wilczynski lived in a two-story house and was the primary care giver for an infant during the period of her alleged disability.

78. Accordingly, upon consideration of all of the facts which were presented to the Employee Claim Department and during the review process, the court finds that the decision to terminate Wilczynski's disability benefits to be well-grounded in reason.[16] Wilczynski failed to provide the court with any evidence that any important document or evidence was intentionally disregarded or were overlooked. There is also no evidence that the decisionmakers significantly erred in appreciating the significance of the evidence before them. The evidence in the record shows that the individuals involved in the decision to terminate Wilczynski's disability benefits followed routine established procedures and acted reasonable based on the evidence before them.

B. *Wilczynski Failed To Exhaust Her Administrative Remedies*

79. In remanding this case, the Seventh Circuit stated:

· "If, on remand, Lumbermens is able to come forward with evidence that it did offer Wilczynski the opportunity to review pertinent documents and that counsel rejected the offer and reasserted his all-or-nothing demand, Lumbermens may be entitled to summary judgment on this basis."

*Wilczynski v. Lumbermens Mut. Casualty Co.,* 93 F.3d 397, 403 n .5 (7th Cir.1996). While the court believes that this issue is rendered moot by its finding that the decision to terminate Wilczynski's disability benefits was not an abuse of discretion, the court will address it because this particular issue was specifically raised by the Seventh Circuit.

80. ERISA, 29 U.S.C. § 1133, and the regulations promulgated thereunder, indicate the procedures that must be followed in denying a claim under an employee benefit plan. However, strict compliance with these procedures is not required. "Rather, substantial compliance with the regulations is sufficient for purposes of § 503." *Tolle v. Carroll Touch, Inc.,* 23 F.3d 174, 180 (7th Cir.1994). Although Kemper National Insurance Companies' individual review procedures exhibit some procedural defects, its procedures, viewed as a whole, satisfy the statutory requirements; thus, Kemper National Insurance Companies' procedures substantially comply with the regulations. *Donato v. Metropolitan Life Ins. Co.,* 19 F.3d 375, 382 (7th Cir.1994).

81. Wilczynski was obligated to exhaust all administrative remedies prior to proceeding to federal court. *See, e.g., Lindemann v. Mobil Oil Corp.,* 79 F.3d 647, 650 (7th Cir. 1996); *Powell v. AT & T Communications. Inc.,* 938 F.2d 823, 826 (7th Cir.1991) (the exhaustion doctrine is the mechanism for enforcing the desire of Congress that plan fiduciaries, not courts, should have primary responsibility for resolving ERISA claims).

82. There is no question that Wilczynski went through two levels of appeal. Kemper

---

16. Wilczynski tried to submit evidence concerning her condition subsequent to December 1993. The court refused to hear such testimony on the basis of relevance. Since the court is obligated to determine if the decision to deny benefits is arbitrary and capricious, the only evidence that is relevant is evidence which was available to the Employee Claim Department prior to December 2, 1993.

National Insurance Companies argues, however, that there was a third appeal level which Wilczynski failed to exhaust. Wilczynski argues that there was no third level and that this level was simply an artifice not supported by the Kemper Plan, which is now being used to prohibit Wilczynski from pursuing her claim in Court.

83. While the evidence is clear that the written Kemper Plan does not provide for a three step appeal process, the Kemper Plan also does not prohibit adding a third step to the appeal process. Instead the Kemper Plan simply says that "the benefit sponsor shall establish a claims review procedure that meets the standard of applicable law." (D.Ex. 1 at p. 11.) Additionally, the evidence shows that in 1993, a third appeal step was used consistently and that Wilczynski received full and timely notice of the third appeal level.

84. As the Kemper Plan does not prohibit a third level of appeal and Wilczynski was given full and timely notice of this level of the appeal process, the court fails to see why this appeal level should be disregarded. Accordingly, the court finds that there was a third level of appeal.

85. Wilczynski initially indicated that she would take advantage of this third level of appeal through her attorney. However, Wilczynski's attorney took the position that he did not have to process the appeal unless he could review the entire contents of Wilczynski's claim file. However, Wilczynski's attorney was not entitled to hold up the appeal process pending the receipt of the entire Wilczynski claim file. Instead, Wilczynski was only entitled to review the pertinent documents. The requirement of providing "pertinent documents" means that the claimant know "what evidence the decision-maker relied upon, having an opportunity to address the accuracy and reliability of that evidence, and having the decision-maker consider the evidence presented by both parties prior to reaching and rendering his decision." *Halpin v. W.W. Grainger. Inc.*, 962 F.2d 685 (7th Cir.1992) (*quoting, Brown v. Retirement Committee of Briggs & Stratton Retirement Plan*, 797 F.2d 521, 534 (7th Cir.1986)).

86. In this case, Wilczynski was in fact given the numerous opportunities to review the pertinent documents on which the decision to deny her disability benefits were made. Despite this offer, the court finds that Wilczynski's attorney demanded at all times nothing less than the entire contents of Wilczynski's claim.

87. The court finds that while it may have been zealous advocacy, Wilczynski's attorney did not have the right to persist in his all-or-nothing demand to the point of not pursuing the third level appeal before going to court. Accordingly, as Wilczynski did not have any excuse for not pursuing her final internal appeal when the time period expired, Wilczynski's instant action is also barred by this failure to exhaust the Kemper Plan's remedies. *Wilczynski*, 93 F.3d at 403 (7th Cir. 1996).

### C. *Wilczynski Failed To Elect COBRA Continuation Coverage*

88. Wilczynski's failure to elect COBRA continuation coverage within the 60 day period after her receipt of a notice of eligibility renders her ineligible for COBRA continuation coverage. 29 U.S.C. § 1165; *Garcia v. Ponce Fed. Bank. F.S.B.*, 779 F.Supp. 620 (D.P.R.1991), *aff'd*, 979 F.2d 890 (1st Cir.1992).

89. Wilczynski first testified she mailed the form herself and then changed her testimony claiming she gave the form to her husband to mail. (Tr. at 60, 61.) Later in her testimony she claims that her husband mailed her COBRA election form to CobraServ within the 60 day period.

90. The court finds Wilczynski also testified that the election form was sent by regular mail even though she admitted sending other important documents by certified mail. Wilczynski claimed she sent this form by regular mail even though she also testified to her great concern of having medical insurance in place because she was pregnant at the time.

91. The mere fact that Wilczynski testified that she placed a call to CobraServ before the election period expired is irrelevant because a timely written election was

the only way Wilczynski could properly notify CobraServ that she was electing COBRA coverage. The court does, however, find it significant that despite being aware that CobraServ had not received her election form on May 20, 1994, the due date for the election, Wilczynski did not try to send a telegram or fax an election form to CobraServ.

92. In light of the foregoing, the court finds that Wilczynski's evidence on whether a timely election was made to be not credible or convincing. Instead, the court finds that Wilczynski did not mail the election form on time. Therefore, the court finds that CobraServ did not receive a timely election form from Wilczynski.

93. Accordingly, Wilczynski has not met the requirements of 29 U.S.C. § 1162 for the election of continuation of her medical insurance benefits because she did not make her election of COBRA continuation benefits within 60 days of her receipt of her notice of COBRA eligibility.

94. Further, during the time Wilczynski participated in the appeal process of the denial of her COBRA continuation benefits, there was no evidence submitted that (1) her husband had in fact mailed her election form; or (2) the letter was ever received by CobraServ. Based on the information before the decisionmaker on appeal, the decision to uphold the denial of COBRA benefits to Wilczynski was not incorrect regardless of whether such a decision was reviewed on an abuse of discretion or *de novo* basis.

### III. CONCLUSION

For the foregoing reasons, judgment is entered in favor of Defendant and against Plaintiff on all counts.

IT IS SO ORDERED.