**Dail CARPENTER, Plaintiff,**

v.

**CNA, CONTINENTAL CASUALTY, COMPANY, Defendant.**

**No. C–3–00–398.**

United States District Court, S.D. Ohio, Western Division.

Dec. 3, 2002.

Don Little, Dayton, OH, for Plaintiff.

DECISION AND ENTRY SETTING FORTH FINDINGS OF FACT AND CONCLUSIONS LAW; OPINION SUSTAINING DEFENDANT'S MOTION FOR JUDGMENT ON THE MERITS (DOC. # 16) AND OVERRULING PLAINTIFF'S MOTION FOR JUDGMENT ON THE MERITS (DOC. # 20); JUDGMENT TO ENTER IN FAVOR OF DEFENDANT AND AGAINST PLAINTIFF; TERMINATION ENTRY

RICE, Chief Judge.

Plaintiff Dail Carpenter ("Carpenter") filed a Complaint (attached to Doc. # 1) for declaratory judgment under Ohio law in the Montgomery County (Ohio) Common Pleas Court, seeking a declaration of his rights under a long-term disability benefits insurance plan. On the premise that Carpenter's benefits plan, available to him through his employer, comes within the ambit of the Employee Retirement and Income Security Act, 29 U.S.C. § 1001, *et seq.* ("ERISA"), Defendant CNA, Continental Casualty Company ("CNA"), the insurer, removed the action to this Court. *See* 28 U.S.C. § 1441; *id.* § 1331; 29 U.S.C. §§ 1132(e)(1) & 1144(a); *Metropolitan Life Ins. Co. v. Taylor,* 481 U.S. 58, 63, 107 S.Ct. 1542, 95 L.Ed.2d 55 (1987).

The facts are not in dispute. Carpenter submitted a claim for long-term disability benefits to his insurer, CNA, and said claim was approved, but only for a 24-month period. In evaluating whether he would be eligible for benefits after the initial 24-month period, CNA found that Carpenter was not totally disabled, and that he was capable of performing any number of jobs suitable for one with his education and employment background. Thus, it concluded that continued long-term disability benefits were not warranted under the terms of the benefits plan.

It is Carpenter's contention that CNA has wrongly denied him long-term disability benefits. Carpenter previously moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. (*See* Doc. # 14). The Court overruled his motion on the ground that a Rule 56 motion is not the proper mechanism for reviewing ERISA benefits decisions. (*See* Doc. # 19); *Wilkins v. Baptist Healthcare System, Inc.*, 150 F.3d 609, 619 (6th Cir. 1998). Because the Court's consideration of Carpenter's claim is limited to a review of the evidence that was actually before the CNA plan administrator who rendered the decision of which Carpenter now complains, *see Perry v. Simplicity Engineering, a Division of Lukens General Indus., Inc.*, 900 F.2d 963, 966–67 (6th Cir.1990), the Court directed Carpenter to file a memorandum for judgment on the merits of the administrative record (*see* Doc. # 19 at 12), which he has now done. (*See* Doc. # 20.)

CNA, for its part, previously moved to dismiss Carpenter's Complaint on the basis that he had failed to state a claim upon which relief can be granted. (*See* Doc. # 16.) It was CNA's argument that because his claim for a declaratory judgment was plead pursuant to Ohio law, it was preempted by ERISA, 29 U.S.C. § 1144(a). In the alternative, and in the same filing, CNA moved for a judgment on the merits. In the same Decision and Entry in which it overruled Carpenter's Motion for Summary Judgment, the Court overruled CNA's Motion to Dismiss. Finding that there was no dispute that Carpenter's state law claim for a declaratory judgment could have been stated as an ERISA claim itself, under 29 U.S.C. § 1132(a)(1)(b), such that it was properly removed to this Court pursuant to the complete preemption doctrine, *see Metropolitan Life, supra*, the Court held that it could not be dismissed pursuant to traditional preemption principles, as CNA had advocated. (Doc. # 19 at 4–10.) The Court did not consider CNA's alternative Motion for Judgment on the Merits.

Since the parties have moved for judgment on the merits of the administrative record and have stipulated to the administrative record, a copy of which has been filed with the Court (Doc. # 12 at attachment), the Court shall proceed to rule on the merits of the Plaintiff's claim.

I. *Findings of Fact* [1]

1. Carpenter was insured through a group disability insurance plan ("Plan") that his employer, Elano Corporation, held with CNA. The group insurance plan provided for both short and long-term disability coverage. (AR at 001–032.)

2. Under the terms of the Plan, after an insured had exhausted his short-term disability coverage, he was entitled to 24 months of long-term disability coverage if he could demonstrate that he was "totally disabled," which required proof that he was "continuously unable to perform the substantial and material duties of his regu-

---

**1.** The administrative record to which the parties have stipulated, attached to Document No. 12, consists of 138 numbered pages. The Court will refer to such as "AR at [page # ]."

lar occupation," was "under the regular care of a licensed physician," and was "not gainfully employed in any occupation for which he is or becomes qualified by education, training or experience" (*Id.* at 003 & 015.)

3. After the expiration of the initial 24–month period, an insured was entitled to continued coverage of same, provided that he was "continuously unable to engage in any occupation for which he is or becomes qualified by education, training or experience," and remained "under the regular care of a licensed physician." (*Id.* at 015.)

4. If the insured was under the age of 59 on the date his disability commenced, he was eligible for such coverage until his 65th birthday. (*Id.* at 009.)

5. In the event of disability, an insured had 30 days after the beginning of the loss (i.e., the beginning of the period of disability) to file a claim for benefits, or as soon as reasonably possible. Written proof, describing the occurrence, extent and nature of the loss, was due within 90 days after the end of the period of loss for which CNA was liable, or as soon as reasonably possible, no later than one year after the time it was otherwise due (unless the insured/claimant was incapacitated). CNA was to commence monthly long-term disability benefits payments to the insured/claimant immediately after it received "due written proof of loss." (*Id.* at 004 & 019.)

6. Carpenter submitted a claim for short-term disability benefits on September 4, 1998, at which point in time he was 42 years old. In the attached physician's statement, Carpenter's physician, Paul F. Heyes, M.D., indicated that Carpenter's disabling condition was "peripheral vascular disease with claudication," [2] and that he was scheduled to undergo several surgical procedures to treat the condition. (*Id.* at 135 & 136.)

7. By letter of September 16, CNA notified him that his claim had been approved and that he would be entitled to short-term disability benefits through November 1 of that year. (*Id.* at 125.)

8. Carpenter submitted a claim for long-term disability benefits on March 1, 1999. Doctor Heyes noted in his attached statement that Carpenter had since undergone the scheduled surgery but continued to suffer from his disabling condition. With respect to his condition, Dr. Heyes noted that it was complicated by "systemic atherosclerotic disease," that Carpenter was required to take aspirin daily, would be required to undergo an angiography,[3] and would thereafter require a yearly exam and angiography "unless complications arise." As far as physical limitations were concerned, Dr. Heyes noted that Carpenter could not lift anything over 25 pounds, was to avoid prolonged standing, and was unable to stoop. He further noted that Carpenter suffered no mental or nervous limitations, and stated as his prognosis that Carpenter suffered from "poor to chronic peripheral vascular disease and chronic back pain." For his own part, Carpenter indicated that he was prevented from returning to work due to "pain, swelling, [and] numbness." (*Id.* at 101–103.)

9. By letter of March 25, CNA notified Carpenter that his claim had been ap-

---

**2.** "Claudication" is a condition which causes the patient to experience ever-intensifying pain in his legs the more he stands or walks, to the point that he cannot continue doing so. *See* Dorland's Illustrated Medical Dictionary 276 (26th ed.1981).

**3.** "Angiography" is a diagnostic procedure in which a contrast material is introduced into the patient's bloodstream so as to highlight his blood vessel's, thus enabling his physician to visualize same for purposes of determining whether any medical conditions exist. *See* Dorland's, *supra* note 2, at 76.

proved and that he would be entitled to long-term disability benefits, paid in monthly installments, for a period of 24 months (effective as of February 27), provided he remained unable to return to his own occupation, and thereafter only if he could demonstrate that he would be unable to maintain any occupation. (*Id.* at 096–097.)

10. By letter of September 10, 1999, CNA requested of Dr. Heyes his patient notes for Carpenter, which he duly supplied. On September 20, after having reviewed said notes, a vocational case manager for CNA determined, on the basis of all of the information provided by Dr. Heyes, that Carpenter would be able to perform a number of suitable occupations were his condition to stay the same, including: desk clerk, counter clerk, telephonic order clerk, and bench worker, all of which existed in his immediate geographic location. She also noted for the record that Carpenter's own then recent representations to her that his condition had been worsening were unsupported by any medical documentation. (*Id.* at 084–086.)

11. By letter of February 21, 2000, CNA informed Carpenter that it had determined, on the basis of Dr. Heyes' patient notes and the vocational case manager's analysis, that his condition did not prevent him from performing other occupations and that, therefore, it would terminate his long-term disability benefits after February 26, 2001, the end of the 24–month period for which he was entitled to benefits as long as he remained unable to perform his own occupation. In the same letter, CNA indicated that in lieu of receiving monthly benefits for the following year, he could opt to take a lump sum payment, representing the total benefits he would otherwise receive over the course of that coming year. He was also informed that payment of the lump sum was conditioned on his releasing CNA from any future long-term disability benefits liability. CNA did not inform him in that letter of what occupations it had determined he was capable of performing. (*Id.* at 079–081.)

12. By letter of March 30, 2000, counsel for Carpenter inquired of CNA as to what other occupations there were for which it had determined Carpenter was qualified, what medical reports it had relied upon in making its determination, what vocational analysis had been conducted, and why it was making a determination of Carpenter's continued long-term disability status a full 12 months prior to the expiration of his initial 24–month period of benefits. (*Id.* at 068–069.)

13. By letter of May 8, CNA responded to the inquiry by Carpenter's counsel. With particular reference to the question of why it had made its determination to terminate Carpenter's long-term disability benefits at the conclusion of the initial 24–month period a full year prior to that date, it stated, in part:

> Some [claims] we can determined [sic] early[,] some closer to the end of the [initial 24–month period]. There is no set time period. However, we do evaluate the claim should additional medical information be made known to our office that could change our position. It is better to let our clients know as soon as possible as this determination can be made so that they can plan their future, go to school to obtain additional training or obtain medical records we may not have in order that we reconsider our position.

(*Id.* at 063–064.)

14. This lawsuit was initially filed on July 27, 2000, but was deemed settled, and dismissed, on December 26, 2000. (Doc. # s 1 & 7.)

15. By letter of January 16, 2001, CNA notified Carpenter that his claim had been returned to the CNA Claims Unit for additional review, and that he was entitled to submit any additional information to assist it in determining whether he would be eligible for long-term disability benefits beyond the expiration of the initial 24–month period. (*Id.* at 060.)

16. Around the same time, Dr. Heyes informed CNA, in response to its own inquiry, that Carpenter's functional limitations remained the same as what they were on March 1, 1999, when he applied for long-term disability benefits, to wit: that he could not lift over 25 pounds, and was unable to stand for long periods or stoop. (*Id.* at 057.)

17. By letter of January 23, 2001, CNA informed Carpenter that it again had been determined that he was capable of performing in several occupations, and that, accordingly, his long-term disability benefits would terminate as of February 26 of that year. CNA also informed him that it would reconsider its decision at his request or if he were to provide it with any additional medical information which it had not yet considered. In addition, it informed him that he had a right to appeal the decision as provided for by ERISA. (*Id.* at 053–054.)

18. By letter of February 7, in response to CNA's letter of January 23, Carpenter requested a reconsideration, and submitted into the record a letter from Dr. Heyes to Carpenter's counsel, dated December 7, 2000. In his letter, Dr. Heyes stated, in part:

Dale was seen in the office today, 12/7/00.

As you know, he has a significant history of peripheral vascular disease, had previous aortobifemoral bypass 9/16/98. Subsequent to that he developed an incisional hernia which has remained stable, and has not been repaired. He has chronic swelling in the left leg, good pulses palpable in both feet. He has a history of chronic hypertension, hyperlipidemia. Recently he has been having symptons suggestive of angina pectoris. He is to discuss this further with his medical physician, and probably needs cardiology work up.

At any rate, given his multiple medical problems, I would consider him totally disabled, and not able to perform any type of work whatsoever.

(*Id.* at 051–052.)

19. By letter of March 14, 2001, CNA informed Carpenter that its decision remained the same, on the basis that he had not provided it "with any medical evidence to support that [he was] unable to perform the sedentary occupations" which it had previously determined he was capable of performing. He was further informed that it would forward his claim to the Appeals Committee for further review. (*Id.* at 047.)

20. By letter of March 19, the Appeals Committee informed Carpenter that it had affirmed the decision to terminate his long-term disability benefits as of February 26. It did not dispute the existence of his medical condition, only his claim that he was unable to perform any occupation because of such. It noted as probative evidence of his ability to perform in certain sedentary occupations the statement received from Dr. Heyes in mid-January of that year that his functional limitations remained the same as they had been in March of 1999, when he had applied for long-term disability benefits. Moreover, it discounted, as unsupported by actual medical evidence, Dr. Heyes' antecedent statements contained in the letter of December 7, 2000, to Carpenter's counsel, that Carpenter had symptoms of angina pectoris and was unable to perform any type of work. Nevertheless, it left the door open

to further review, allowing Carpenter to submit any additional medical evidence of his condition by April 30, 2001. (*Id.* at 037–039.)

21. The Court reopened the case on May 16, 2001. (Doc. # 11.)

## II. *Opinion*

■ In reviewing the decision of an administrator who has denied ERISA plan benefits, the Court must first determine the appropriate standard of review, and then determine whether, subject to the constraints of that standard, it can be said that the administrator's decision was made in error. The Court will discuss these questions in turn.

### A. *Standard of Review*

■ With respect to the initial question, Carpenter argues that the Court should employ a *de novo* standard of review, while CNA argues that it should employ an arbitrary and capricious standard of review. (Of course, they both argue, in the alternative, that if the Court determines that the standard to be employed is not that which they endorse in their respective arguments, the outcome should still be the same under the alternative standard.)

■ The Supreme Court has stated that "a denial of benefits . . . is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). A district court must determine that the ERISA plan in question gave "a clear grant of discretion to the administrator to determine benefits or interpret the plan" before it reviews the administrator's decision pursuant to the arbitrary and capricious standard. *See Perez v. Aetna Life*

*Ins. Co.*, 150 F.3d 550, 555 (6th Cir.1998) (*en banc*).

The argument over the correct standard to be applied in this case comes down to the language contained in a specific uniform provision of the Plan:

TIME OF PAYMENT OF CLAIM. Benefits will be paid monthly immediately after We receive due written proof of loss.

(AR at 019.) CNA argues that the word "due" means "sufficient" or "satisfactory" or the like, such that the language "due written proof of loss" should be understood as vesting in the administrator the "discretionary authority to determine eligibility for benefits," as contemplated by the Supreme Court in *Firestone*. Carpenter argues that the word "due" is ambiguous, and should be construed in his favor to mean those written proofs of loss that are required to be submitted to CNA in a timely fashion in support of a claimant's claim. In other words, according to him, "due" means "owed" or that which is required to be submitted by a specified date. He contends that his interpretation should be adopted by the Court for two reasons: 1) because ambiguous terms in an insurance contract should be construed in favor of the insured, who did not draft the ambiguity (*see Perez*, 150 F.3d at 557 n. 7); and 2) because the phrase in question is contained in a provision dealing with "time of payment of claim," a juxtaposition which lends credence to the position that "due" is to be taken with regard to its temporal connotation.

Although Carpenter's argument has merit, the Court agrees with CNA on this question for several reasons. *First*, the fact that the phrase inclusive of the word "due" happens to be found in the provision regarding "time of payment of claim" is of limited relevance. The phrase "time of payment of claim" itself is directed toward

the time at which CNA is obligated to make benefits payments to the claimant, not to the time at which the claimant is obligated to submit his written proof of loss, something which is dealt with in a separate provision. Thus, although, for reasons more fully stated below, it may be somewhat relevant that the word "due" is not used as a modifying adjective in the separate provision setting forth the requirement that a claimant provide "written proof of loss," the fact that it is placed in the "time of payment of claim" provision is not dispositive.

*Second,* and more to the point, the Sixth Circuit, in another instance, considered identical language, identically placed in the plan there at issue, and in so doing affirmed the district court's ruling that such was indicative of a decision to vest in the claim administrator the discretionary authority to determine eligibility for benefits. *See Leeal v. Continental Casualty Co.,* 17 Fed.Appx. 341 (6th Cir.2001). In concluding as it did, the Court of Appeals adopted the decision and explanation of the district court. *Id.* at 343. The district court's decision, in turn, was rendered after a review of a number of decisions from various federal and state courts which had, in that court's opinion, reached the same conclusion on the basis of language either similar to, or even less indicative of a grant of discretion than, the language utilized in the plan at issue therein. *See Leeal v. Continental Casualty Co.,* Case No. 99–CV–60384–AA, at 6–9 (E.D.Mich. Jan. 27, 2000) (Steeh, J.).

In particular, the district court in *Leeal* noted for support of its decision the Sixth Circuit's decision in *Perez, supra.* In *Perez,* an *en banc* court, over the dissent of six judges of that court, held that where the administrator was given "the right to require as part of the proof of claim satisfactory evidence ... that the claimant has furnished all required proofs for such ben-

efits," such language vested in said administrator the discretion to determine eligibility for benefits. 150 F.3d at 555–557. In reaching its conclusion, it noted favorably, among others, the following cases in which discretion was found to have been vested in the ERISA plan administrator: *Patterson v. Caterpillar, Inc.,* 70 F.3d 503, 505 (9th Cir.1995) ("benefits will be payable only upon receipt by the Insurance Carrier or Company of ... due proof ... of such disability"), *Caldwell v. Life Ins. Co. of North America,* 959 F.Supp. 1361, 1365 (D.Kan.1997) (benefits paid upon receipt of "due proof" that employee is disabled), and *Bollenbacher v. Helena Chem. Co.,* 926 F.Supp. 781, 786 (N.D.Ind.1996) (benefits paid "[w]hen the Company receives proof that the individual is disabled"). 150 F.3d at 556.

If this Court were considering Carpenter's argument as a matter of first impression, it might be persuaded by his grammatical argument, taken along with the canon of construction he invokes, to decide this issue in his favor. As alluded to above, CNA's argument on the meaning of "due" is questionable given the fact that the uniform provision immediately preceding that entitled "TIME OF PAYMENT OF CLAIM," where the language at issue herein is found, is entitled "WRITTEN PROOF OF LOSS," and it is only "written proof," not "due written proof," that is required of a claimant. Arguably, it is this "written proof of loss" provision, not the "due written proof of loss" language contained in the "time of payment of claim" provision, that should control the outcome. After all, if the original intent of the drafter had been that something more than mere "written proof" be submitted, it could reasonably be expected that this would have been clearly expressed in the "written proof of loss" provision (e.g., such might have been entitled "DUE WRITTEN PROOF OF LOSS"). This position

picks up support from a more recent, published opinion from the Sixth Circuit, in which it was held that the requirement that the insured submit only "written proof of loss" to the insurer, without more, does not contain a clear grant of discretion to the insurer to determine benefits or interpret the plan. *See Hoover v. Provident Life and Accident Ins. Co.*, 290 F.3d 801, 808 (6th Cir.2002);[4] *see also Chiera v. John Hancock Mut. Life Ins. Co.*, 3 Fed. Appx. 384, 390 (6th Cir.2001) ("That Defendant must be provided with 'written proof of loss' does not explicitly grant it discretionary authority.").[5]

Be that as it may, the Court's slate is not blank, and the question of how the particular language used in the Plan at issue herein should be construed has been answered in the Sixth Circuit, albeit in an unpublished decision. *See Leeal, supra.* Moreover, although *Leeal*, in which the identical language and placement of the word "due" was used, is an unpublished decision, the Seventh Circuit, in *Patterson, supra*, and the District of Kansas, in *Caldwell, supra*, two published cases which the Sixth Circuit cited favorably in its own published *en banc* decision in *Perez*, both concluded that the arbitrary and capricious standard applied where very similar, though not identical, language was used.

In *Patterson*, the pertinent language stated that "benefits will be payable only upon receipt by the Insurance Carrier or Company of such notice and such due proof, as shall be from time to time required, of such disability." 70 F.3d at 505. In *Caldwell*, the pertinent language read: "The Insurance Company will begin paying Monthly Benefits in amounts determined from the Schedule when it receives due proof [of disability]." 959 F.Supp. at 1365. Pursuant to principles of *stare decisis*, and on the basis of Leeal, *Perez, Patterson*, and *Caldwell*, the Court agrees with CNA that in reviewing its decision denying continued long-term disability benefits to Carpenter, the arbitrary and capricious standard of review is the proper standard to employ.

**B. *The Merits of the Plan Administrator's Decision***

 As noted, both parties submitted arguments on how the Court should view the merits of CNA's decision to deny continued long-term disability benefits to Carpenter pursuant to the arbitrary and capricious standard. Thus, the Court will now turn to that question. "The arbitrary [and] capricious standard is the least demanding form of judicial review of administrative

4. At least one court cited by the *Aetna* court reasoned that the key consideration in this type of analysis is not the meaning of the modifying adjective in front of the word "proof," but the meaning of the word "proof" itself. As the *Bollenbacher* court noted, "it is difficult to detect a qualitative difference between plan language that requires a claimant to submit 'proof' and one that requires the submission of 'such due proof' or even 'satisfactory proof.' " 926 F.Supp. at 787. "Indeed, adjectives like 'satisfactory' seem rather redundant when teamed with the concept of 'proof.' " *Id.* This sentiment, coupled with the *Perez* court's holding that the administrator, where it is the only other party to a bilateral insurance contract, is the only likely party in whom the right to review the "proof" was

vested, 150 F.3d at 557, might have at one point inspired a second basis for this Court to conclude that Carpenter's employer, in agreeing to the terms of the Plan, vested in CNA the discretionary authority to determine eligibility for Plan benefits. However, this particular aspect of the *Bollenbacher* decision was decisively rejected by the Sixth Circuit in *Hoover*.

5. Despite the tension between *Hoover* and *Chiera* on one hand, and *Leeal* on the other, *Hoover* did not effectively overrule *Leeal*. The ERISA plan terminology at issue in *Hoover* (and in *Chiera* ) did not contain any separate reference to "due written proof," as did the terminology at issue in *Leeal* and the terminology at issue herein.

action. [citation omitted.] When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." *Davis v. Kentucky Fin. Cos. Ret. Plan,* 887 F.2d 689, 693 (6th Cir.1989).

One irrelevancy must be noted at the outset. It is of no moment that CNA made its initial determination that it would terminate Carpenter's long-term disability benefits a full 12 months prior to the expected expiration date of his initial 24–month period of eligibility for said benefits, and the fact that it did so is certainly not indicative that its action was arbitrary and capricious. As CNA noted in its follow-up response to counsel for Carpenter, quite frankly, the earlier a determination is made, the sooner a claimant can plan for his future needs, be that with rehabilitation, additional education, or legal action against the plan administrator. Moreover, the early decision makes perfect sense in light of CNA's express offer to provide Carpenter, at that point in time, a lump sum payment equal to the total benefits he could have otherwise expected to receive over the ensuing 12 months, in exchange for a release from any future benefits liability. There is nothing arbitrary or capricious about tendering such an offer. As a final point on this issue, the fact that CNA expressly and continually stated that it would leave the door open for reconsideration of its decision, in the event Carpenter were to provide it with additional medical information, makes it evident that the timing of its original decision was harmless to his interests. If anything, it was a benefit,

and allowed him to prepare for this litigation in the timely fashion which he did.

Indeed, because the entire basis for Carpenter's argument rests with the merits of CNA's decision after it obtained a copy of Dr. Heyes' letter of December 7, 2000, addressed to his counsel, the disagreement giving rise to this case is simply stated: after it received Carpenter's request for reconsideration, dated February 7, 2001, in which he included a copy of the aforementioned letter from Dr. Heyes' to his counsel, in which Dr. Heyes opined that Carpenter was unable to perform "any type of work whatsoever," was CNA's decision to deny continued benefits on the basis of its review of Carpenter's functional limitations, as noted by Dr. Heyes in both March of 1999 and again in January of 2001, arbitrary and capricious? The relevant decisions of CNA to be considered are, therefore, (1) that made in response to Carpenter's request for reconsideration, rendered by letter of March 14, 2001, and (2) that of the Appeals Committee, rendered by letter of March 19, 2001.[6]

Prior to its receipt of Carpenter's request for reconsideration, dated February 7, 2001, it was perfectly reasonable for CNA to conclude that Carpenter would be capable of performing in any occupation which did not require him to lift more than 25 pounds, stand for prolonged periods of time, or stoop. After all, those were the only limitations imposed upon him by Dr. Heyes, and nothing in his existing patient notes, copies of which Dr. Heyes had forwarded to CNA at its request, indicated

6. For reasons stated immediately below, at the time Carpenter filed his Complaint, and prior to its premature dismissal by this Court on December 26, 2000, CNA had not acted arbitrarily and capriciously, as it did not even have in its possession at that point in time a copy of Dr. Heyes' letter of December 7, 2000. Because both parties have stipulated to the inclusion of post-dismissal materials in the Administrative Record, the Court will treat Carpenter's Complaint as one encompassing the events which occurred between the time the Court prematurely dismissed this action on December 26, 2000 (*see* Doc. # 7), and the time it reopened the case on May 16, 2001 (*see* Doc. # 11), and will not require him to move for leave to amend same.

that his condition had worsened. If anything, it was noted by Dr. Heyes that his condition had improved. (*See* AR at 085.) There being no evidence in the administrative record that the jobs of desk clerk, counter clerk, telephonic order clerk, or bench worker, would impose duties beyond those limitations, CNA's initial decision to notify Carpenter that his long-term disability benefits would be terminated after February 26, 2001, cannot be deemed arbitrary and capricious.

Whether CNA's decision to stand by its original decision even after receiving Carpenter's request for reconsideration, in which he included a copy of Dr. Heyes' letter of December 7, 2000, to his counsel, stating that he was unable to perform "any type of work whatsoever," is a closer question. The Court finds it somewhat disingenuous for CNA to have stated, as it did to Carpenter on several occasions, that Dr. Heyes' opinion that he (Carpenter) could not perform even sedentary work and that he showed symptoms of angina pectoris were not supported by medical evidence. As far as this Court is concerned, a physician's opinion *is medical evidence,* and whether such is stated in his official office patient notes or in a letter to the patient's attorney is irrelevant. Doctor Heyes' opinion, stated in a letter to counsel for Carpenter, that Carpenter was not capable of performing "any type of work whatsoever" cannot be so easily dismissed simply because it did not come attached to patient notes, lab analyses, etc.

On the other hand, as CNA points out, Dr. Heyes noted in a subsequent correspondence, in January, 2001, that Carpenter's functional limitations remained unchanged from March of 1999. Thus, even after it received Carpenter's request for reconsideration, in February of 2001, CNA had a reasonable basis for finding that nothing prevented Carpenter from undertaking an occupation in which he was not required to lift more than 25 pounds, stand for prolonged periods of time, or stoop. Had his functional limitations been greater at that time, CNA could ·have expected, reasonably, that Dr. Heyes would have stated as much, as it had requested he do. (*See* AR at 057.)

Clearly, by the time CNA received Carpenter's request for reconsideration, and Dr. Heyes' letter of December 7, 2000, it had received arguably conflicting information from Dr. Heyes on the extent of Carpenter's disability. The *most* reasonable, sensible, and fair thing to do at that point would probably have been to put the question directly to Dr. Heyes as to whether, in his medical opinion (which CNA had clearly respected previously in awarding both short and limited long-term disability benefits), Carpenter would be capable of performing the various sedentary occupations suggested by its vocational case manager. Instead, it went ahead and reaffirmed, both on reconsideration and then on appeal, its initial decision to terminate benefits as of February 26, 2001.

The arbitrary and capricious standard does not require an administrator to take the *most* reasonable action, however, only *a reasoned one,* and the Court believes that, faced with conflicting information from Dr. Heyes, CNA's action was both reasoned and reasonable, particularly given the fact that it rested its decision on the information which Dr. Heyes provided later in time, which tended to indicate that Carpenter would have no trouble performing in the sedentary occupations described by its vocational case manager. Where an ERISA plan vests discretion in the plan administrator to determine questions of eligibility, as long as it has offered a reasoned basis for its decision, such that it is not arbitrary and capricious, the court must accept its decision, and may not substitute its own judgment for that of the

administrator. *See, e.g., Coastal Tank Lines, Inc. v. Interstate Commerce Comm'n,* 690 F.2d 537, 543 (6th Cir.1982) (discussing arbitrary and capricious standard in the context of a challenge to an agency action under the Administrative Procedure Act).

One additional and significant factor assures the Court that this is the correct decision. In its letter of March 19, 2001, the Appeals Committee again left the door open to further review, informing Carpenter that it was "willing to review any additional medical evidence he would like to submit concerning his condition," provided such was submitted by April 30, 2001. (AR at 038.) In other words, though it had come to a firm determination, it expressed a willingness to consider further arguments; it simply put the onus on Carpenter to reveal the true extent of his limitations instead of affirmatively seeking a clarifying explanation from Dr. Heyes on its own. There is no indication in the record that Carpenter availed himself of this opportunity. The fact that Carpenter did not fully exhaust all available opportunities to convince CNA that its decision was wrong merely adds weight to the Court's finding that CNA's decision was a reasoned one. Because it was so, judgment on the merits must enter for the Defendant.

III. *Conclusions of Law*

1. The Plan at issue herein vested discretion in CNA, as the administrator, to determine a claimant's eligibility for benefits.

2. The proper standard of review of CNA's decision to deny continued long-term disability benefits to Carpenter is the arbitrary and capricious standard.

3. CNA's decision to deny said benefits to Carpenter was not arbitrary and capricious.

Based on the foregoing, Defendant CNA's Motion for Judgment on the Merits (Doc. # 16) is SUSTAINED and Plaintiff Carpenter's Motion for Judgment on the Merits (Doc. # 20) is OVERRULED. The Court hereby directs judgment on the merits to be entered in favor of the Defendant.

The captioned cause is hereby ordered terminated upon the docket records of the United States District Court for the Southern District of Ohio, Western Division, at Dayton.